**In the Interest of A.C., Appellant.**

**In re A.C.**

**Appeal of A.C.**

Superior Court of Pennsylvania.

Argued Oct. 20, 2009.
Filed March 15, 2010.

Armand R. Cingolani, III, Butler, for A.C., appellant.

Gerri V. Paulisick, Butler, for Butler County, appellee.

BEFORE: BENDER, SHOGAN and FITZGERALD *, JJ.

* Former Justice specially assigned to the Superior Court.

Opinion by BENDER, J.:

¶ 1 A.C. (Appellant) appeals from the order committing him to one year of involuntary inpatient treatment for potentially sexually violent behavior in accordance with 42 Pa.C.S. § 6403. Appellant raises several claims challenging the constitutionality of this statute. For the reasons that follow, we affirm.

¶ 2 The trial court summarized the procedural and factual history of this case as follows:

Appellant was born [in] January [of] 1984. On April 11, 2002, he was adjudicated delinquent for Indecent Assault. He was placed on probation for two years. As a condition of his probation, he was required to attend weekly counseling sessions at the Ministries of Eden. Appellant went to live at Valley Community Services, a mental health group home. In the spring of 2003, the sessions were reduced to twice a month. In the summer and fall of 2003, Appellant made inappropriate contact with the same female staff member at Valley Community. When questioned about the second incident, Appellant admitted that had the opportunity presented itself, he would have assaulted the staff member. At the same time, Appellant began attending Community College of Allegheny County for janitorial classes. While in attendance, he targeted a female student on campus and indicated that he planned to rape her. Appellant was detained at the Ministries of Eden shelter until a dispositional review hearing and psychiatric evaluation took place. Appellant returned to the Ministries of Eden group home subject to a safety plan that included sex offender counseling and constant supervision. He was also ordered to attend Butler County Juvenile Court Services Offender Group ("BCJCSOG").

While in BCJCSOG, Appellant refused to follow the rules. By his own admission, he actively sought out sexually inappropriate material on his weekend visits with his mother. He did so knowing that his actions were contrary to the program designed to address and treat his sexual issues. Rather than working within the structure and design of the program to block these unhealthy visions, his fantasies became increasingly more deviant and complex; they involved scenarios of dressing in black, covering his eyes and wearing gloves to prevent identification, culminating with raping a woman and hanging her until death.

On May 26, 2004, the Sexual Offender Assessment Board determined that Appellant met the criteria for placement pursuant to Act 21, 42 Pa.C.S.A. § 6403 ("Act 21 § 6403").

On December 16, 2004, we found that clear and convincing evidence existed to meet the requirements for placement under Act 21 § 6403.

From the October 28, 2008 hearing, the Court found that [A.C.] continues to suffer from mental abnormality or personality disorder which results in a serious difficulty in controlling sexually violent behavior that makes him likely to engage in an act of sexual violence and otherwise meets all criteria necessary for further commitment pursuant to 42 Pa.C.S.A. § 6403. The Sex Offender Assessment Report was incorporated into the Court's [October] 28, 2008 Order. The Sexual Offender Assessment Board found that [A.C.] has a mental abnormality (Pedophilia and Paraphilias NOS) that makes it likely he will engage in sexually aggressive behavior. The Sexual Offender Assessment Board found that [A.C.] has demonstrated covert sexual aggression in the form of

rape fantasies. Furthermore, he was found to continue to meet the criteria as delineated in the statute for civil commitment of Sexually Violent Delinquent Children.

Trial Court Opinion (T.C.O.), 2/3/09, at 1–3. The court's order committed Appellant to undergo treatment in the Pennsylvania Sexual Responsibility and Treatment Program in the Torrance State Hospital. Appellant has appealed from this order and presented several questions for our review.

¶ 3 This appeal has an unusual procedural posture, as it is actually two appeals from separate commitment orders, one from 2007 and the other from 2008, which we have consolidated for purposes of disposition. The 2007 order, like the 2008 order, also committed Appellant to an inpatient treatment program for one year. Appellant has filed two briefs for these appeals, and each of these briefs is approximately fifty pages in length. Although each brief contains two questions for our review, the questions are identical, yet the arguments presented are different. Thus, we have before us for consideration over seventy pages of argument. While we would normally proceed through such a lengthy argument addressing the issues as they arise *seriatim*, our task here is complicated by the lack of any subdivision in the argument. Nonetheless, after review, we have discerned that the brief corresponding to the 2007 appeal raises more distinct constitutional claims, while the brief for the 2008 appeal presents more philosophical arguments that are best described as one large substantive due process claim. There is some overlap in the arguments between the briefs, and we have taken the liberty to merge the arguments where it is appropriate. We shall list the questions that appear in both briefs and then proceed to the combined arguments of both briefs.

1. Whether Act 21, 42 Pa.C.S.A. § 6401 et. seq. are an unconstitutional violation of Appellant's Constitutional Rights under the Pennsylvania Constitution and the United States Fifth Amendment right to due process, Eight Amendment right against cruel and unusual punishment and Fourteenth Amendment right to equal protection of the law by illegally discriminating against a protected class of persons where the statute's means are not narrowly tailored to fit the compelling interests of the ends of the statute, both personal in the Appellant and in protecting society?

2. Whether the civil commitment process violates the Appellant's Federal Fifth Amendment right to not offer testimony which would tend to incriminate the person as he is required by law to tell state actors what he is thinking.

Brief for Appellant at 4 (2007).

¶ 4 Both appeals center around the constitutionality of legislation enacted in 2004 with the purpose of establishing the

rights and procedures for the civil commitment of sexually violent delinquent children who, due to a mental abnormality or personality disorder, have serious difficulty in controlling sexually violent behavior and thereby pose a danger to the public and further provides for additional periods of commitment for involuntary treatment for said persons.

42 Pa.C.S. § 6401. *See also* 42 Pa.C.S. §§ 6401–6409 (Act 21). Three requirements must be met before a person falls within the purview of Act 21. First, the person must be a juvenile who was adjudicated delinquent for an act of sexual violence, which if committed by a person as an adult would be a violation of one of an enumerated set of sex offenses. *See* 42

Pa.C.S. § 6403(a)(1). Second, the person must have been committed to a juvenile facility or institution and remains at that institution when the person reaches twenty years of age. *See* 42 Pa.C.S. § 6403(a)(2). Third, a determination must be made that the person is in "need of involuntary treatment due to a mental abnormality or personality disorder which results in serious difficulty in controlling sexually violent behavior that makes the person likely to engage in an act of sexual violence." 42 Pa.C.S. § 6403(a)(3).

¶ 5 Pursuant to 42 Pa.C.S. § 6358, the State Sexual Offenders Assessment Board is charged with assessing a person who has committed a sexually violent offense and remains in a juvenile facility upon attaining twenty years of age. Under Act 21, if this assessment concludes that the person is "in need of involuntary treatment," and the court concludes that a *prima facie* case has been presented, the court is to order that a petition be filed by the county solicitor or designee indicating that the person has met the three requirements of Section 6403(a) outlined above and should be involuntarily committed. *See* 42 Pa.C.S. § 6403(b)(1). After the filing of the petition, the court is required to hold a hearing at which the person has the right to appointed counsel if the person cannot afford counsel. *See* 42 Pa.C.S. § 6403(b)(3). The person also has the right to be assisted by an expert in this field, and if he or she cannot afford one, the court will pay for one. *See* 42 Pa.C.S. § 6403(b)(4). The hearing shall be conducted as follows:

(1) The person shall not be called as a witness without the person's consent.

(2) The person shall have the right to confront and cross-examine all witnesses and to present evidence on the person's own behalf.

(3) The hearing shall be public.

(4) A stenographic or other sufficient record shall be made.

(5) The hearing shall be conducted by the court.

(6) A decision shall be rendered within five days after the conclusion of the hearing.

42 Pa.C.S. § 6403(c).

¶ 6 At the hearing, it is the Commonwealth that bears the burden of proof of showing by clear and convincing evidence that "the person has a mental abnormality or personality disorder which results in serious difficulty in controlling sexually violent behavior **that makes the person likely to engage in an act of sexual violence.**" 42 Pa.C.S. § 6403(d) (emphasis added). If the Commonwealth meets this burden, the court is to enter an order committing the person to inpatient treatment for a period of one year. *See* 42 Pa.C.S. § 6404(a). The commitment is subject to review sixty days before the expiration of the one-year period. *See* 42 Pa.C.S. § 6404(b)(1). The review occurs by means of a hearing in accordance with the process set forth above under Section 6403(c), at which the Commonwealth bears the same burden established by Section 6403(d). *See* 42 Pa.C.S. § 6404(b)(2). This process can proceed indefinitely, year after year, until a court finds that the Commonwealth has not adduced sufficient evidence to establish that the person "continues to have serious difficulty controlling sexually violent behavior due to a mental abnormality or personality disorder that makes the person likely to engage in an act of sexual violence." 42 Pa.C.S. § 6404(c).

¶ 7 In the instant case, Appellant was subjected to this process and was committed involuntarily on December 16, 2004. Since that time, the court has renewed the commitment every year. Before us are appeals from the 2007 and 2008 commit-

ments. Though Appellant makes fleeting claims regarding the quantum of evidence introduced at the hearings he does not squarely attack the sufficiency of the evidence. Thus, we do not have before us a claim that the Commonwealth failed to demonstrate by clear and convincing evidence that Appellant was likely to commit an act of sexual violence due to a mental abnormality or personality disorder. Nonetheless, we shall here present some background information of Appellant's condition in 2008, as it is useful for the ensuing discussion of Appellant's constitutional claims.

¶ 8 The Sex Offender Assessment Report (hereinafter "Report"), dated September 15, 2008, was incorporated into the trial court's November 28, 2008 order. The Treatment Summary portion of the Report begins with an account of Appellant's history of repeatedly molesting "at least three children, two males and one female, who are his cousins." Reproduced Record (No. 1967 WDA 2008) (R.) at 5a. This occurred over a period of six years and involved vaginal, anal and oral intercourse. R. at 9a. The Report states that although Appellant "has made significant progress over the past year . . . [,] he continues to be plagued by violent and paraphilic fantasies." R. at 6a. In addition, Appellant's "thoughts of committing sexual violent acts continue, and he doesn't always process them openly, and continues to have a great deal to learn within the context of the treatment program regarding relapse prevention." R. at 5a. Appellant has undergone "sexual interest testing," the results of which "strongly support his current diagnosis of pedophilia." R. at 6a.

¶ 9 Some of Appellant's fantasies included "becoming aroused to the thoughts of tying up the victims and beating them, sometimes to death." R. at 6a. However, some progress has been made by Appellant in the last year as he has started "verbally processing healthy fantasies" and his deviant fantasies have become less violent. R. at 6a, 8a. Yet Appellant still has fantasies of victimizing children, of ages six to twelve, and he "reinforces [these fantasies] through masturbation." R. at 6a. As a result, the Report concludes that Appellant "continues to have a mental abnormality that makes him likely to be sexually aggressive in a predatory fashion." Based on the foregoing, the court concluded that the Commonwealth had met its burden in establishing that Appellant should be involuntarily committed for one year pursuant to 42 Pa.C.S. § 6403.

¶ 10 In the first question presented for our review, Appellant presents several constitutional challenges to Act 21. "At the outset, we note that our standard of review when considering appellant's constitutional challenges is plenary, as these challenges involve pure questions of law." *Commonwealth v. Leddington,* 908 A.2d 328, 331 (Pa.Super.2006).

> The standard of review we apply to the court's conclusion is exacting. A statute will be found unconstitutional only if it clearly, palpably and plainly violates constitutional rights. Under well-settled principles of law, there is a strong presumption that legislative enactments do not violate the constitution. Further, there is a heavy burden of persuasion upon one who questions the constitutionality of an Act.

*Commonwealth v. MacPherson,* 752 A.2d 384, 388 (Pa.2000) (citations and quotation marks omitted).

¶ 11 We begin with Appellant's equal protection challenge, in which he claims that Act 21 implicates a "fundamental right of liberty," and therefore, is subject to a strict scrutiny analysis. Brief for Appellant at 10 (2007).

When addressing an equal protection challenge, we must initially ascertain the appropriate degree of scrutiny to which the challenged act is to be subjected. Equal protection analysis recognizes three types of governmental classification, each of which calls for a different standard of scrutiny. The appropriate standard of review is determined by examining the nature of the classification and the rights thereby affected.

In the first type of case, where the classification relates to who may exercise a fundamental right or is based on a suspect trait such as race or national origin, strict scrutiny is required. When strict scrutiny is employed, a classification will be invalid unless it is found to be necessary to the achievement of a compelling state interest.

The second type of case involves a classification which, although not suspect, is either sensitive or important but not fundamental. Such a classification must serve an important governmental interest and be substantially related to the achievement of that objective.

The third type of situation involves classifications which are neither suspect nor sensitive or rights which are neither fundamental nor important. Such classifications will be valid as long as they are rationally related to a legitimate governmental interest.

*Commonwealth v. Hilliar*, 943 A.2d 984, 996 (Pa.Super.2008).

¶ 12 This Court has decided two cases addressing the level of scrutiny to be applied in evaluating an equal protection challenge to Act 21. However, in the earlier case we employed the rational basis test and in the latter case we employed the strict scrutiny test. *See In re S.A.*, 925 A.2d 838, 846 (Pa.Super.2007); *In re K.A.P.*, 916 A.2d 1152, 1161 (Pa.Super.2007). While this Court's use of differ-ent tests to evaluate whether the same law violates equal protection may at first blush seem to present a conflict of authority, in fact these cases do not conflict with one another because they addressed different types of equal protection claims.

■ ¶ 13 In *In re K.A.P.*, this Court evaluated an equal protection challenge in which the appellant argued that Act 21 was unconstitutional because it treated juvenile sex offenders more harshly than Megan's Law treated adult sex offenders, which subjects adult offenders to notification and registration provisions after they have served their sentence but not involuntary commitment. *See In re K.A.P.*, 916 A.2d at 1162. *See also* 42 Pa.C.S. §§ 9791–9799.9 (Megan's Law). The appellant argued that the rational basis test applied, and we specifically noted: "Given that Appellant limits his argument in this fashion, we need not decide whether any other level of scrutiny should apply." *In re K.A.P.*, 916 A.2d at 1161 n. 6. Moreover, since the appellant's argument was based on the different treatment the law accords juvenile sex offenders versus adult sex offenders, the claim did not implicate a suspect classification. *See San Antonio Independent School Dist. v. Rodriguez*, 411 U.S. 1, 28, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) (outlining the "traditional indicia of suspectness" as whether the class is "saddled with disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process"). *See also U.S. v. LeMay*, 260 F.3d 1018, 1030 (9th Cir.2001) (stating, "Sex offenders are not a suspect class."). We reasoned that there was a rational basis for the legislature's distinction between these two groups.

First, we note that the statute seeks to promote a legitimate public value. As

Appellant himself notes, juveniles ordinarily leave the jurisdiction of the juvenile court system when they reach age 21. In passing [Act 21], the Legislature foresaw that some of these juveniles were sexual offenders (and potential reoffenders) in need of treatment for their own benefit and for the protection of the public. The Legislature provided a program of involuntary civil commitment to serve those needs. In the absence of such a program, these offenders would presumably be released outright once they reached age 21.

Next, we note that the age distinctions in Chapter 64 are rationally related to that legitimate goal. While a similar program of civil commitment does not exist for adult offenders under Megan's Law, Appellant fails to recognize that adult sexual offenders usually serve a term of imprisonment before they are released. Adult offenders may also be subject to probation thereafter. Thus, the criminal justice system already exists to protect the public from adult offenders. We also note that state prisons may provide mental health services to sex offenders. Even if prisons do not provide such services, the Legislature may reasonably believe that juveniles are more amenable to treatment than adult offenders. Because we can see a rational basis for the distinctions between [Act 21] and Megan's Law, Appellant's equal protection claim fails.

*Id.* at 1162 (citations and footnote omitted).

¶ 14 Whereas in *In re K.A.P.* we addressed an equal protection challenge claiming that Act 21 created disparate treatment for juvenile sex offenders, in *In re S.A.*, we addressed whether Act 21 implicates a fundamental right. We concluded that it did, as it implicated a juvenile's "right to physical freedom." *In re S.A.*, 925 A.2d at 846. *See also Foucha v. Loui-*

*siana,* 504 U.S. 71, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992) (stating that "[f]reedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action" and that this extends to freedom "from indefinite confinement in a mental facility"). Consequently, we evaluated Act 21 under a strict scrutiny test to determine whether the Commonwealth has a compelling state interest that Act 21 addresses.

As discussed above, § 6401 evidences a desire by the General Assembly to establish civil commitment procedures designed to provide necessary treatment to sexually violent delinquent children and to protect the public from danger. It is undisputed that the Commonwealth has a compelling interest in protecting its citizens from danger. Thus, we find that Chapter 64 promotes a compelling state interest.

As to the final consideration in regard to equal protection, particularly in light of inherent provisions contained in Act 21 for annual review, which serve as a means to guard against excessive commitment of a juvenile, we find that Act 21 is narrowly tailored to effectuate the state's interest in protecting the public. Consequently, we conclude that Appellant's claim that Act 21 violates principles of equal protection is without merit.

*In re S.A.,* 925 A.2d at 847 (citations omitted).

¶ 15 Turning to Appellant's equal protection arguments, we note that he claims both that Act 21 is unconstitutional due to its impact on a "fundamental right of liberty" and that he is part of a suspect class. Brief for Appellant at 10 (2007). Appellant makes these arguments in an effort to show that this Court should employ a strict scrutiny analysis. Beyond that, however, he abandons this argument and

goes on to his next argument. Following the precedent set forth above, both these arguments must fail, as this Court has already determined that the Commonwealth has a compelling state interest justifying the Commonwealth's limitation on Appellant's fundamental right to liberty from restraint, and that Appellant is not part of a suspect class. *See id.* *See also In re K.A.P.,* 916 A.2d at 1162.

■ ¶ 16 The next issue that Appellant presents is a claim that Act 21 is penal in nature. His argument on this issue is difficult to decipher. He states it as follows: "Act 21 violates the Appellant's equal protection rights. Appellant is penally confined for a civil definition. This requires a finding of punitive effect to negate the General Assembly's intention that the statute be deemed civil and remedial." Brief for Appellant at 12 (2007).

¶ 17 In *In re S.A.,* we addressed a claim that because Act 21 was penal in nature, and therefore, because it is an allegedly criminal statute, the Commonwealth should be held to the higher standard of proof beyond a reasonable doubt. *See In re S.A.,* 925 A.2d at 838. After undertaking a lengthy analysis, which is unnecessary to reproduce here, we held that "Act 21 has a non-punitive purpose and non-punitive effect" and therefore "it does not constitute punishment." *Id.* at 845. Our holding in *In re S.A.* was also consistent with the Supreme Court's decision in *Addington v. Texas,* 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979), in which the Court held that the intermediate evidentiary standard of "clear and convincing evidence" satisfied the due process protections of the Fourteenth Amendment. *Id.* at 432–33, 99 S.Ct. 1804. *But see Foucha,* 504 U.S. at 86, 112 S.Ct. 1780 (invalidating a Louisiana statute that placed the burden of proof not on the government, but on the person who had been subjected to involun-

tary commitment). Because Act 21 places the burden on the Commonwealth to establish by clear and convincing evidence that the person is likely to commit a sexually violent act before it can subject that person to a one-year period of involuntary civil commitment, Appellant's argument on this issue is to no avail.

¶ 18 At various points in Appellant's argument he claims that he is being committed for "criminal fantasies" and that because he has "criminal thoughts[,] he remains civilly committed." Brief for Appellant at 30 (2007). In *Kansas v. Hendricks,* 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997), the Court addressed whether a Kansas statute, similar to Act 21 yet applicable to adult offenders, violated Hendricks' substantive due process rights. The Court held:

> Where the State has "disavowed any punitive intent"; limited confinement to a small segment of particularly dangerous individuals; provided strict procedural safeguards; directed that confined persons be segregated from the general prison population and afforded the same status as others who have been civilly committed; recommended treatment if such is possible; and permitted immediate release upon a showing that the individual is no longer dangerous or mentally impaired, we cannot say that it acted with punitive intent.

*Id.* at 368–69, 117 S.Ct. 2072.

¶ 19 In *Hendricks,* Hendricks had a long history of sexually molesting children and was scheduled for release from prison when he came within the purview of the statute. The State subjected Hendricks to involuntary commitment, and he appealed. "The Kansas Supreme Court invalidated the Act, holding that its precommitment condition of a 'mental abnormality' did not satisfy what the court perceived to be the 'substantive' due process requirement that

involuntary civil commitment must be predicated on a finding of 'mental illness.' " *Id.* at 350, 117 S.Ct. 2072. Both the State of Kansas and Hendricks petitioned the Supreme Court for review. The Court granted *certiorari* on both the State's petition and Hendricks' cross-petition.

¶ 20 The statute in question established procedures for the involuntary commitment of persons who had committed a sexual offense, were scheduled for release from prison, and yet due to a mental abnormality, were likely to commit acts of sexual violence. The statute placed the burden on the state to establish *beyond a reasonable doubt* that a person met the statute's criteria for commitment. The Court first addressed the State's argument that the statute did not violate an individual's substantive due process rights:

The challenged Act unambiguously requires a finding of dangerousness either to one's self or to others as a prerequisite to involuntary confinement. Commitment proceedings can be initiated only when a person has been convicted of or charged with a sexually violent offense, and suffers from a mental abnormality or personality disorder which makes the person likely to engage in the predatory acts of sexual violence. The statute thus requires proof of more than a mere predisposition to violence; rather, it requires evidence of past sexually violent behavior and a present mental condition that creates a likelihood of such conduct in the future if the person is not incapacitated. As we have recognized, [p]revious instances of violent behavior are an important indicator of future violent tendencies.

A finding of dangerousness, standing alone, is ordinarily not a sufficient ground upon which to justify indefinite involuntary commitment. We have sustained civil commitment statutes when

they have coupled proof of dangerousness with the proof of some additional factor, such as a mental illness or mental abnormality. These added statutory requirements serve to limit involuntary civil confinement to those who suffer from a volitional impairment rendering them dangerous beyond their control. The Kansas Act is plainly of a kind with these other civil commitment statutes: It requires a finding of future dangerousness, and then links that finding to the existence of a mental abnormality or personality disorder that makes it difficult, if not impossible, for the person to control his dangerous behavior. The precommitment requirement of a mental abnormality or personality disorder is consistent with the requirements of these other statutes that we have upheld in that it narrows the class of persons eligible for confinement to those who are unable to control their dangerousness.

*Id.* at 357–58, 117 S.Ct. 2072.

¶ 21 Like the Kansas statute, Act 21 cannot be invoked unless a person is already in the system for a predicate sexual offense. While Appellant repeatedly argues that he is being punished for dreams and fantasies that he has not committed, he ignores the fact that he could never have been subjected to involuntary commitment under Act 21 had he not committed a serious sexual offense in the past. Unlike people who have such thoughts, but due to their normal mental faculties are able to identify the thoughts as deviant and control their impulse to act on them, Appellant has already shown that he lacks such ability to control his actions. And presently, the Sexual Assessment Report indicates that Appellant is likely to commit another sexually violent act if he is not involuntarily committed.

¶ 22 Appellant also argues that the Commonwealth cannot civilly commit "a

man[,] not considered to be mentally ill[,] solely because he is dangerous" and that Appellant's "abnormal personality is not mental illness recognized by the psychiatric community." Brief for Appellant at 32 (2008). We disagree. Act 21, like the Kansas statute, also requires that there be a link between the person's dangerousness and a mental defect. Thus, Section 6403 only permits involuntary treatment where the Commonwealth can show "a mental abnormality or personality disorder *which results* in serious difficulty in controlling sexually violent behavior that makes the person likely to engage in an act of sexual violence." 42 Pa.C.S. § 6403(a)(3) (emphasis added). As in *Hendricks,* the Report here indicates that Appellant was diagnosed with pedophilia, which the Court stated was "a condition the psychiatric profession itself classifies as a serious mental disorder." *Hendricks,* 521 U.S. at 360, 117 S.Ct. 2072. It is this mental abnormality that makes Appellant likely to commit another act of sexual violence, rendering him dangerous to the public, and therefore, subject to involuntary civil commitment.

■ ¶ 23 Next, Appellant argues that Act 21 violates his substantive due process rights because it does not provide for a treatment regimen that can cure Appellant of his condition, which would permit his release. Since the application of the law does not provide for treatment that will cure Appellant, he claims that it must be punitive. Brief for Appellant at 13–42 (2007). In particular, he claims:

> Given that they cannot cure a man, given the probabilities that [A.C.] cannot internally control himself and that they cannot be certain external controls will suffice, no treatment provider can provide a guarantee that [A.C.] will not re-offend, so to be on the safe side, an order of release[ ] can never be recommended.

Brief for Appellant at 22 (2008). In *Hendricks,* the Court addressed this issue when it analyzed the holding of the Kansas Supreme Court:

> Finally, Hendricks argues that the Act is necessarily punitive because it fails to offer any legitimate treatment. Without such treatment, Hendricks asserts, confinement under the Act amounts to little more than disguised punishment. Hendricks' argument assumes that treatment for his condition is available, but that the State has failed (or refused) to provide it. The Kansas Supreme Court, however, apparently rejected this assumption, explaining:

> > "It is clear that the overriding concern of the legislature is to continue the segregation of sexually violent offenders from the public. Treatment with the goal of reintegrating them into society is incidental, at best. The record reflects that treatment for sexually violent predators is all but non-existent. The legislature concedes that sexually violent predators are not amenable to treatment under [the existing Kansas involuntary commitment statute]. If there is nothing to treat under [that statute], then there is no mental illness. In that light, the provisions of the Act for treatment appear somewhat disingenuous."

> It is possible to read this passage as a determination that Hendricks' condition was *untreatable* under the existing Kansas civil commitment statute, and thus the Act's sole purpose was incapacitation. Absent a treatable mental illness, the Kansas court concluded, Hendricks could not be detained against his will.

> Accepting the Kansas court's apparent determination that treatment is not pos-

sible for this category of individuals does not obligate us to adopt its legal conclusions. **We have already observed that, under the appropriate circumstances and when accompanied by proper procedures, incapacitation may be a legitimate end of the civil law.** Accordingly, the Kansas court's determination that the Act's "overriding concern" was the continued "segregation of sexually violent offenders" is consistent with our conclusion that the Act establishes civil proceedings ... especially when that concern is coupled with the State's ancillary goal of providing treatment to those offenders, if such is possible. While we have upheld state civil commitment statutes that aim both to incapacitate and to treat ... **we have never held that the Constitution prevents a State from civilly detaining those for whom no treatment is available, but who nevertheless pose a danger to others. A State could hardly be seen as furthering a "punitive" purpose by involuntarily confining persons afflicted with an untreatable, highly contagious disease.** Similarly, it would be of little value to require treatment as a precondition for civil confinement of the dangerously insane when no acceptable treatment existed. To conclude otherwise would obligate a State to release certain confined individuals who were both mentally ill and dangerous simply because they could not be successfully treated for their afflictions.

*Id.* at 363–64, 117 S.Ct. 2072 (alteration in original) (emphasis added).

¶ 24 What the foregoing establishes is that the government's compelling interest in civilly detaining an individual who is a danger to others is paramount to that individual's liberty interest to be free from restraint. The Court's analogizing of the government's authority under the Kansas statute with that of the government's ability to quarantine individuals with highly contagious diseases is telling. It matters not that a person subject to Act 21 may potentially remain committed indefinitely due to the fact that there is no treatment that can cure the person of his or her mental abnormality. For so long as that individual's mental abnormality results in the individual posing a danger to others, the Commonwealth may civilly confine him or her. While the result of Act 21 may be that Appellant remains committed for many years to come, the law excuses this serious infringement upon his liberty, as it is done for the greater public good of protecting people from the threat presented by individuals who are likely to commit sexually violent acts.

■ ¶ 25 Appellant also challenges the conditions of his confinement, claiming that while the Sexual Offender Assessment Board "has provided a treatment plan, they have not presented an individualized treatment and discharge plan." Brief for Appellant at 10 (2008). Pursuant to 42 Pa.C.S. § 6406, the Pennsylvania Department of Public Welfare (DPW) is charged with the following duties:

(a) **General rule.**—The department shall have the duty to provide a separate, secure State-owned facility or unit utilized solely for the control, care and treatment of persons committed pursuant to this chapter. The department shall be responsible for all costs relating to the control, care and treatment of persons committed to custody pursuant to this chapter.

. . .

(c) **Treatment plans.**—The department, in consultation with the Juvenile Court Judges' Commission and the board, shall develop policies and procedures for providing individualized treatment and discharge plans based on clini-

cal guidelines and professional standards in the fields of sexual offender treatment and mental health.

42 Pa.C.S. § 6406(a), (c).

¶ 26 Although Appellant acknowledges the provisions of Section 6406, he does not articulate a claim demonstrating how this section is constitutionally infirm.[1] In *Hendricks,* the Court cited with approval a similar provision within the Kansas statute that required that the individual be committed for "*control, care and treatment* until such time as the person's mental abnormality or personality disorder has so changed that the person is safe to be at large." *Hendricks,* 521 U.S. at 368, 117 S.Ct. 2072. We are aware of no authority that requires the DPW to provide an individualized treatment plan setting forth the steps an individual must take to gain a release from commitment. All that is required is that the statute provides "treatment if such is possible." *Id.* at 368, 117 S.Ct. 2072. For all of the foregoing reasons, we conclude that Appellant's equal protection and due process claims are without merit.

¶ 27 Appellant's final claim is that Act 21 violates Appellant's Fifth Amendment rights. We note initially, that Appellant's argument on this issue is less than two pages in length. In it he cites no legal authority, nor does he make references to the record. Consequently, we deem this issue waived. *See Commonwealth v. Johnson,* 985 A.2d 915, 924 (Pa. 2009) (stating that "where an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other

meaningful fashion capable of review, that claim is waived").

¶ 28 Assuming arguendo that this issue is not waived, we conclude that it is without merit. "The Fourteenth Amendment secures against state invasion the same privilege that the Fifth Amendment guarantees against federal infringement-the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty ... for such silence." *Malloy v. Hogan,* 378 U.S. 1, 8, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). The protection offered by the Fifth Amendment "applies not only at criminal trials, but in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate [the defendant] in future criminal proceedings." *Commonwealth v. Shrawder,* 940 A.2d 436, 440 (Pa.Super.2007).

¶ 29 There is no indication on the record before us that Appellant's statements during his treatment may incriminate him and subject to him to future criminal proceedings. In fact, a reading of the Report indicates that the focus of Appellant's treatment is his fantasies regarding acts that he has not yet committed and how he deals with them. Certainly, these fantasies cannot serve as the basis for a criminal prosecution. In short, Appellant has not identified any statements that would expose him to future criminal proceedings. Therefore, this argument is without merit.

¶ 30 Order affirmed.

---

1. To the extent that Appellant is arguing that DPW has failed to comply with the requirements of Section 6406, we do not reach this issue as Appellant does not cite that part of the record where such a claim was preserved for our review, nor does he support such a claim with any citation of the facts of record. *See* Pa.R.A.P. 2119. Rather, all we can discern of Appellant's claims is that they attack the constitutionality of Act 21.