J-A08002-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| L.A.W., | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| W.R.W., | |
| Appellant | No. 1477 EDA 2015 |

Appeal from the Order Entered April 16, 2015
In the Court of Common Pleas of Chester County
Domestic Relations at No(s): 2014-12491-PF

BEFORE:  BOWES, OLSON AND STRASSBURGER,* JJ.

MEMORANDUM BY BOWES, J.:                    **FILED AUGUST 16, 2016**

W.R.W. ("Father") appeals from the final protection from abuse ("PFA") order entered on April 16, 2015, wherein the court prohibited Father's contact with L.A.W. ("Mother") and their son, B.W., except to comply with the prevailing child custody order.  We affirm.

The certified record supports the following facts.  Mother and Father divorced prior to the commencement of these proceedings.  B.W. was born of the marriage during July 2008.  Prior to April 2014, Father exercised periods of partial physical custody.  However, following Father's admission that he was suffering from mental health problems, the parties agreed that Mother would supervise his visits with B.W.  Shortly thereafter, Mother received a text photograph from Father's girlfriend that indicated that Father

* Retired Senior Judge assigned to the Superior Court.

had suicidal ideations. Specifically, Father transmitted a text with a photograph of a self-inflicted knife wound in his leg. The accompanying message read, "I don't know if you recognize the pain you don't care to deal with. Tell my son the truth. I have finally found release. I only wanted us." N.T. 4/16/15, at 11; Plaintiff's Exhibit-1. Mother contacted Father, stated her concern about B.W.'s safety, and convinced Father to cancel the supervised visitation that had been scheduled for that evening. N.T., 4/16/15, at 11. The supervised visitations continued on an as-requested basis throughout that summer.

During August 2014, Father was involved in an automobile accident while driving under the influence of alcohol. While convalescing, Father admitted to Mother that the accident was, in fact, a failed attempt to commit suicide. Mother persuaded him to commit himself to mental health treatment for seventy–two to ninety–six hours. Two months later, Father was involved in a second automobile accident. While he did not characterize that collision as another suicide attempt, Mother was suspicious of the incident in light of Father's previous attempt and ideations.

Meanwhile, during October 2014, Father demanded to exercise physical custody independent of Mother's supervision. He argued that his mental health had improved and that supervision was unnecessary. He threatened to file a petition for contempt against Mother if she did not comply with his demands. In anticipation of Father's impending legal

maneuver, Mother filed a motion to modify the existing custody order. The hearing on that motion was scheduled for January 2015.

During the period preceding the modification hearing, Father engaged in increasingly erratic behavior and he harassed Mother by telephone, text messages, and emails. Specifically, on December 11, 2014, Father called Mother at 8:11 p.m. and 8:27 p.m. The next morning between 8:40 and 10:33 a.m., Father called Mother five times from his mobile phone, leaving three brief voicemail messages, and once from his work phone. He followed that onslaught with eleven text messages to Mother between 10:36 a.m. and 10:50 a.m. the same morning. The messages related to their relationship and Father's attempts to contact B.W. Mother issued two responses to Father's inquiries. She informed him, "Stop contacting me" and "I will have him call you when he's home." Plaintiff's Exhibit-2. In addition to the foregoing attempts to communicate with Mother on the morning of December 12, 2014, Father sent Mother three emails trying to establish contact.

As a result of Father's repeated texts, emails, and voicemail messages, Mother contacted the West Whiteland Township Police Department. Officer Robert B. Malarick contacted Father and formally advised him to cease communication with Mother and informed Father that further attempts to contact her could result in his being charged with harassment. During the PFA hearing, Mother testified without objection that the police relayed

Father's statement that he would stop attempting to contact Mother by telephone and that "he was just going to show up at [her] house." N.T., 4/16/15, at 22. While Father did not follow through with his stated intention to menace Mother in person, he called her twice on the following day.

On December 19, 2014, Mother was contacted by her attorney, who relayed a message from Father's counsel indicating that she was withdrawing her representation of Father due to his threatening behavior and advising caution in what she characterized as an unsafe situation. Mother's counsel interpreted the warning as including threats against him and Mother. Upon receipt of the telephone call, Mother retrieved B.W. and his younger half-sister, who is not a party to the final PFA, order from school and took refuge in a local hotel. Mother explained, "we packed up some belongings and we went to a hotel for the evening because of the state of which -- I was concerned for our wellbeing as I did not know what threats were being made against me." *Id*. at 25. The following day, she called the police department to alert it of Father's threats against her custody lawyer. She informed police that she was afraid of Father and requested extra police patrols around her home. The police increased their presence in Mother's neighborhood, told her to call if she observed Father nearby, and provided her information about services designed to combat domestic violence.

On December 23, 2014, West Whiteland Township Police Detective Scott Pezick told Mother that the department had received multiple reports

about Father over the preceding days and that it wanted to discuss the situation with her. Detective Pezick had spoken to Father and advised him to use their respective counsel as intermediaries regarding custody issues, but Father responded that he was going to retrieve B.W. from school on his own. Mother informed Detective Pezick that she "had an extensive history of violence and abuse with [Father] and that he was admittedly mentally ill and that his repeated contact with [her] had [placed her in] a very bad position." *Id*. at 23. In sum, "[she] was afraid of what [Father] was going to do next." *Id*.

Detective Pezick ordered an increased police presence at B.W.'s school until Mother was physically able to recover her son. Mother observed a marked police car at the school when she arrived, and having called the school to advise it of the situation, she was able to obtain B.W. without incident. After collecting B.W. and exiting the building, Mother noticed that two additional marked police cars had arrived. As Father was not observed at the school that day, the intimation he made to Detective Pezick was apparently empty. Nevertheless, the police advised Mother to use extreme caution when dealing with Father and to call 911 immediately if he attempted to contact her.

Based on the foregoing events, Mother obtained a temporary PFA order against Father effective December 23, 2014. The temporary order, which applied to Mother, B.W., and his younger half-sister, was scheduled to

terminate on January 5, 2015, but it was subsequently continued to February 5, 2015 and then to April 16, 2015. The first continuance was due to a lack of service, and the second continuance was made to accommodate the criminal investigation into Father's alleged violation of the Wiretapping and Electronic Surveillance Control Act, 18 Pa.C.S. §§ 5701-5782, as discussed *infra*. When the local Sheriff's Office called Father in an attempt to serve notice of the temporary PFA and inform him of the conditions of the PFA, Father advised the deputy that he did not intend to comply with the order "and that no one was going to keep him away from his kid." ***Id***. at 30.

While the hearing on the final PFA order was pending, Father sent Mother's attorney an email that revealed that Father had surreptitiously recorded an October 2014 telephone conversation with Mother. Father ostensibly proffered the twenty-one minute recording to the attorney in order to establish Mother's alleged duplicity. However, in actuality, by recording Mother secretly and then disseminating that recording to a third party, Father exposed himself to criminal liability for violating sections 5703(1) and (2) of Pennsylvania's Wiretapping and Electronic Surveillance Control Act ("Wiretap Act"). Upon being notified of Father's actions, Mother

contacted Detective Pezick, who, following an investigation, charged Father with, *inter alia*, two counts of violating the Wiretap Act.[1]

The evidentiary hearing was held on April 16, 2015. At the outset of the hearing, Mother suggested that the court continue the hearing pending the criminal matter based upon potential Fifth Amendment concerns if Father elected to testify. Acting *pro se*, Father opposed the continuance and declined to testify during the PFA hearing. Mother testified in favor of the petition and introduced five exhibits. Father presented three witnesses. While Father marked five exhibits for identification, none of the exhibits was admitted into evidence. At the conclusion of the hearing, the trial court entered a final PFA order against Father that precluded him from contacting Mother and B.W. for three years.[2] The PFA order specifically stated that (1) it would yield to the then-existing custody arrangement; (2) it was imposed without prejudice to Father's right to petition to modify custody; and (3) a modified custody order would supersede the final PFA order. This timely appeal followed.

---

[1] On December 10, 2015, Father pleaded guilty to one count of violating § 5703(1) of the Wiretap Act and the trial court imposed thirty days to twelve months imprisonment consecutive to the thirty-day to six months sentence that had been imposed after Father pleaded guilty to DUI following the failed suicide attempt during August 2014.

[2] As the trial court found that Mother had not satisfied her burden of proving an allegation of abuse regarding B.W.'s half-sister, the order did not include that child.

Father raises four questions for our review, which we restate for clarity as follows:

1.     Whether the trial court was biased against Father.

2.     Whether the preponderance of evidence standard outlined in § 6107(a) of the PFA is too slight of an evidentiary burden in light of the rights and liberties that are at stake for the defendant.

3.     Whether the trial court erred in failing to appoint counsel to represent Father during the PFA proceedings.

4.     Whether Mother adduced insufficient evidence to establish a course of conduct that is tantamount to abuse under § 6102(a)(4).

Father's brief at 4-5.

In **Ferko-Fox v. Fox**, 68 A.3d 917, 921 (Pa.Super. 2013), we reiterated, "The purpose of the PFA act is to protect victims of domestic violence from the perpetrators of that type of abuse and to prevent domestic violence from occurring." The petitioner has the burden of proving by a preponderance of the evidence the allegations of abuse. **See** 23 Pa.C.S. § 6107(a). This Court "review[s] the propriety of a PFA order for an abuse of discretion or an error of law." **Ferko-Fox**, at 920. Our Supreme Court has defined abuse of discretion as follows:

> The term 'discretion' imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion, within the framework of the law, and is not exercised for the purpose of giving effect to the will of the judge. Discretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary actions. Discretion is abused when the course pursued represents not merely an error

of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will.

***Commonwealth v. Widmer***, 744 A.2d 745, 753 (Pa. 2000), (quoting ***Coker v. S.M. Flickinger Co.***, 625 A.2d 1181, 1184-855 (Pa. 1993)).

As Father's first and third issues are related, we address those claims jointly. The crux of this argument is that the trial court was biased against him in that an attorney did not represent him and because he refused to consent to a continuance pending the criminal action regarding his violation of the Wiretap Act. While he presents several examples of the trial court's alleged bias during the PFA hearing, his argument is predicated on the foundational position that, while there is no statutory right to PFA counsel, he was entitled to the assistance of counsel in this case as a matter of due process. He continues that, having been denied court-appointed counsel and being unable to afford private representation, the trial court was biased against him for attempting to defend himself *pro se*. Father's claims are wrong as a matter of law and baseless as a matter of fact.

Pursuant to § 6107(a) of the PFA Act, a defendant has the right to be represented by counsel during the PFA hearing to determine whether a final PFA order is warranted. However, as Father appears to concede, there is no statutory right to the appointment of PFA counsel. In ***Weir v. Weir***, 631 A.2d 650 (Pa.Super. 1993), this Court discussed this precise issue and reasoned that, since the PFA is a quasi-civil statute, the requirement that a

defendant be **advised** of his right to representation did not equate to the right to the **appointment** of counsel. We stated,

> Unlike cases arising under the Juvenile Act or cases concerning involuntary commitment, there is no legislatively created right to court-appointed counsel in [PFA] proceedings. Rather, the [PFA] only requires that the court advise a defendant of the right to be represented at the hearing by counsel. **See** 23 Pa.C.S.A. § 6107(a). The right to be represented by counsel cannot be equated with the right to receive court-appointed counsel. The right to be represented by counsel in civil proceedings is one accorded to all individuals. However, all civil litigants do not have the right to court-appointed counsel. The [PFA] thus cannot be construed as requiring the appointment of counsel for indigent parties.

Id. at 657.

Furthermore, while the **Weir** Court passed on the related issue of "whether a PFAA action is the type of proceeding which involves the deprivation of a constitutional right so as to require the appointment of counsel," **id**., at 657-658, in **Varner v. Holley**, 854 A.2d 520, 523 (Pa.Super. 2004), this Court subsequently interpreted the **Weir** Court's discussion as holding "that a PFA action is not the type of proceeding which involves the deprivation of a constitutional right so as to require the appointment of counsel." Hence, as illustrated in **Varner**, the principle that no right to counsel exists under the PFA Act is well ensconced. Thus, where, as here, Father was advised of his right to representation during the hearing and neglected to request the appointment of counsel, assert his indigence, or contact a lawyer referral service as suggested by the formal notice of

hearing, his predicate argument that the PFA process is unjust fails as a matter of law.

Moreover, Father's specific allegations of bias also fail. As we previously reiterated in *In re In the Interest of S.H.*, 879 A.2d 802, 808 (Pa.Super. 2005), a mere adverse ruling, without more, does not demonstrate bias. Father first asserts that the trial court admonished him for complaining that Mother did not provide adequate notice of her request for a continuance. Next, he contends that, while the trial court reminded Mother's counsel to move for the admission of her exhibits, it deliberately declined to remind Father about that necessity. Additionally, Father argues that the trial court threatened him with contempt for leveling too many objections. Finally, Father asserts that the trial court's evidentiary rulings disfavored him disproportionally. In support of this position, he highlights four instances where the trial court declined to rule in his favor in disposing of the parties' countervailing objections to the testimony. As highlighted, *infra*, the certified record belies all of Father's allegations of bias.

Despite Father's protestations to the contrary, the trial court did not admonish him for challenging the timeliness of Mother's request for a continuance pending the completion of the criminal matter. While the trial court questioned Father's cryptic reference to "Section 209" as a basis to oppose the continuance, in reality the court not only supported Father's opposition to the motion but it also advised Father, "if you don't want a

continuance then there will be a hearing." N.T., 4/16/15, at 5.[3] There is nothing in the certified record to support Father's claim that the trial court intimidated him based on his desire to proceed with the PFA hearing on April 16, 2015. Hence, this claim fails.

Similarly, the certified record will not sustain Father's contentions that the trial court threatened him with contempt for leveling too many objections during the hearing or that it ruled against him disproportionally. The allegation implicates an exchange with the trial court wherein Father reiterated an objection to a question and added commentary after the court had overruled his initial objection. The brief exchange occurred as follows:

> Q. I am going to take you back to some of the events leading up to the case. Can you please tell the court about [Father's] behavior last spring?
>
> [Father]:    Objection, relevance.
>
> The Court: Overruled.
>
> The Witness:        In April of 2000[. . . ]
>
> [Father]:    Objection, relevance.
>
> The Court: Overruled.
>
> [Father]:    This pertain[s] nothing to [Mother].

---

[3] Father's brief indicates that he attempted to invoke "PA Rules [sic] of Civil Procedure" 209. **See** Father's brief at 7. However, his ostensible clarification is unhelpful because Pa.R.C.P. 209 was rescinded effective January 1996.

The Court: Overruled. You keep up with this [and] there is not going to be much of a hearing because you're going to be downstairs. You may answer the question. April of 2014?

N.T., 6/16/15, at 8-9.

Apparently conceding that the foregoing interaction fails to evince trial court bias on its own, Father complains that, while the trial court threatened him with contempt if he persisted with his objections, the court neglected to admonish Mother's counsel for similar conduct. Again, however, the record does not support Father's allegation of disparate treatment. While the court did not threaten Mother's counsel with contempt for her missteps during the hearing, it reprimanded her for a variety of reasons. For instance, the court displayed impatience for counsel's disorganized exhibits, chided her repeatedly for raising objections prematurely, criticized the grounds of her objections, and complained about her enunciation and presentation. *Id*. at 21, 45, 57, 66, 79. In addition, the trial court chastised Mother's counsel for what it deemed to be a superfluous statement that she rested her case-in-chief with reservation to recall her client if necessary. The court corrected, "You're resting your case in chief, is that what you are saying? . . . And you might have rebuttal testimony? . . . All right. If there is appropriate proper rebuttal testimony at that time you'll be permitted. . . . It is without reservation." *Id*. at 65-65. The record belies Father's claims of bias.

Likewise, Father's assertion of disparity in the manner that the court disposed of the parties' evidentiary objections is not persuasive. Generally,

- 13 -

"[o]ur standard of review for a trial court's evidentiary rulings is narrow. ***Commonwealth v. Mickel***, 2016 PA Super 132 *3. Therefore, "[t]he admissibility of evidence is solely within the discretion of the trial court . . . [.]" ***Id***.

Instantly, the certified record confirms that the trial court ruled on the parties' objections impartially. In disposing of Father's objections, the court sustained six of ten objections he leveled against Mother's direct testimony, sustained two objections to Mother's exhibits, and overruled several of Mother's objections to the testimony that Father adduced at trial. Father highlights four specific examples in which the trial court purportedly ruled against him. While his precise argument is unclear, Father asserts baldly that the trial court "used the objections by [the parties] to shape the proceedings and was able to suppress significant evidence that should have been considered by a fair and impartial judge." ***See*** Father's brief at 7. Father provides one-paragraph summaries for each of the evidentiary determinations; however, he fails to argue, much less explain, how the four rulings establish the trial court's bias. Indeed, rather than assail the trial court's impartiality, at best, Father's obscure references to the noted testimony are facial challenges to the merits of the court's evidentiary rulings, issues that were not included or fairly suggested in his statement of questions presented. Hence, those challenges are waived. Pa.R.A.P. 2116(a) ("No question will be considered unless it is stated in the statement

- 14 -

of questions involved or is fairly suggested thereby."); *see e.g*., *Southcentral Employment Corp. v. Birmingham Fire Ins. Co. of Pennsylvania*, 926 A.2d 977, 983 n.5 (Pa.Super 2007) (issue waived because it was not explicitly raised in appellant's statement of questions involved). As the trial court dispensed its criticisms evenly and ruled fairly on the parties' various objections, we reject Father's assertion of bias.

Father's final assertion of bias is premised upon the fact that the trial court declined to prompt him to move for the formal admission of the exhibit that he marked and presented during his defense. Significantly, at the close of Mother's case-in-chief, the trial court inquired of her counsel, "Any exhibits you wanted to put into evidence?" N.T., 4/16/15, at 59. Father complains that the court did not extend a similar courtesy to him.

The record reveals that, when Mother's counsel attempted to level an anticipatory objection to one of Father's exhibits, the trial court interceded, "I don't want to get highly technical here, but has anybody offered the exhibits into evidence?" *Id*. at 78. Following a brief exchange during which the trial court twice asked counsel when Father had moved for the exhibit's admission, counsel eventually understood the implication and withdrew the purported objection. As Father did not comprehend the significance of the exchange, he failed to formally request that the trial court admit the exhibits into evidence.

Unlike Father's other assertions of bias, this contention has a factual predicate. That is, in this isolated instance, the trial court treated Mother and Father differently. Nevertheless, no relief is due.

As a preliminary matter, we note that the trial court was not obligated to assist Father in navigating the procedural pitfalls of self-representation. In *Commonwealth v. Freeland*, 106 A.3d 768, 776 (Pa.Super. 2014), we stressed, "a *pro se* litigant must comply with the procedural rules set forth in the Pennsylvania Rules of the Court." Furthermore, in *Commonwealth v. Gray*, 608 A.2d 534, 550 (Pa.Super. 1992) (quotation omitted), we reiterated, "Any layperson choosing to represent himself in a legal proceeding must, to some reasonable extent, assume the risk that his lack of expertise and legal training will prove his undoing." Thus, the trial court was not constrained to assist Father based on his status as a layman.

Moreover, in light of the certified record as a whole, this remote example of the court declining to extend a professional courtesy to Father that it previously had extended to Mother's counsel, does not establish trial court bias. Significantly, although the trial court was not obliged to assist Father, it was sensitive to the fact that Father was proceeding *pro se.* Indeed, the court's decision to avert its assistance in this instance was inconsistent with its actions throughout the hearing. Specifically, the trial court previously guided Father in leveling evidentiary objections, questioning Mother on cross-examination, and marking and identifying defense exhibits.

- 16 -

Ideally, the court would have also informed Father of the formal requirement to move the exhibit into evidence. Although it did not, mindful of the court's impartial rulings and the assistance it provided Father throughout the proceeding, we cannot find that the trial court's isolated act demonstrated a bias against Father. Thus, we also reject this claim.

We address Father's remaining claims jointly. He argues that the evidentiary burden required to attain a final PFA order is too slight and that notwithstanding this reduced threshold, Mother's evidence was insufficient to sustain the final PFA order. Father concedes, as he must, that the PFA Act demands that a petitioner adduce only a preponderance of evidence in order to satisfy his or her evidentiary burden. In this regard, he asserts that the relaxed burden is unjust and violative of his due process rights. He also challenges the statutory definition of "abuse" pursuant to § 6102(a)(2) and maintains that the low evidentiary threshold permitted Mother to prove her case against him despite what he characterized as scant evidence of threats or harassment.[4] Unfortunately for Father, beyond his bare assertion of

_____

[4] The PFA defines abuse as follows:

"Abuse." The occurrence of one or more of the following acts between family or household members, sexual or intimate partners or persons who share biological parenthood:

(1) Attempting to cause or intentionally, knowingly or recklessly causing bodily injury, serious bodily injury, rape,

*(Footnote Continued Next Page)*

- 17 -

injustice and his assessment of the evidence that Mother adduced during the hearing, he does not develop his claims with any legal argument or citation to relevant legal authority. At most, Father alleges a lack of evidence of imminent serious bodily injury and attempts to justify his pernicious behavior throughout this case, including the violations of the Wiretap Act, as a reasonable response to the impediments that he believed Mother and her counsel erected to prevent him from exercising physical custody of B.W. Thus, any assertion that the PFA Act is constitutionally infirm is waived. **See**

_(Footnote Continued)_ ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

involuntary deviate sexual intercourse, sexual assault, statutory sexual assault, aggravated indecent assault, indecent assault or incest with or without a deadly weapon.

(2) Placing another in reasonable fear of imminent serious bodily injury.

(3) The infliction of false imprisonment pursuant to 18 Pa.C.S. § 2903 (relating to false imprisonment).

(4) Physically or sexually abusing minor children, including such terms as defined in Chapter 63 (relating to child protective services).

(5) Knowingly engaging in a course of conduct or repeatedly committing acts toward another person, including following the person, without proper authority, under circumstances which place the person in reasonable fear of bodily injury. The definition of this paragraph applies only to proceedings commenced under this title and is inapplicable to any criminal prosecutions commenced under Title 18 (relating to crimes and offenses).

23 Pa.C.S. § 6301(a)(1-5).

*In re W.H.*, 25 A.3d 330, 339 n.3 (Pa.Super. 2011) (quoting *In re A.C.*, 991 A.2d 884, 897 (Pa.Super. 2010)) ("where an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived.").

Moreover, Father's assertion that Mother did not establish abuse defined as a reasonable fear of imminent serious bodily injury pursuant to § 6102(a)(2) fails. Notwithstanding Father's protestations, Mother was not limited to that definition of abuse. In reality, Mother proved by a preponderance of the evidence abuse defined under § 6102(a)(5) as "a course of conduct or repeatedly committing acts toward another person . . . under circumstances which place the person in reasonable fear of bodily injury." Specifically, she established that over a two-day period during December 2014, Father harassed her relentlessly via telephone, text message, and email. He rebuffed police directions to leave Mother alone and threatened to "just . . . show up at [her] house." N.T., 4/16/15, at 15. Thereafter, he threatened Mother and her counsel, which led Mother to take refuge overnight in a local hotel. Undaunted, three days later, Father informed police of his intent to defy their directives, again, and physically remove B.W. from school. While Father failed to follow through with this threat, the ruse placed Mother in fear "of what [Father] was going to do next." *Id*. at 23.

Indeed, even when faced with notice of the PFA proceedings, Father advised the Sheriff's deputy that he did not intend to comply with the temporary PFA order if it interfered with his custodial rights. *Id*. at 30. These events are even more alarming when superimposed over Father's history of erratic behavior. Accordingly, we find that the trial court did not commit an abuse of discretion in finding that Mother proved by a preponderance of the evidence that Father engaged in a course of conduct under circumstances that placed her in fear of bodily injury.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/16/2016