J-S78029-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: Z.J., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.W.J., FATHER | No. 787 WDA 2016 |

Appeal from the Order Entered May 5, 2016
In the Court of Common Pleas of Allegheny County
Orphans' Court at No(s): CP-02-AP-0000053-2015

BEFORE:  BENDER, P.J.E., OTT, J., and FITZGERALD, J.[*]

MEMORANDUM BY OTT, J.:                    **FILED NOVEMBER 18, 2016**

J.W.J. ("Father") appeals from the order entered May 5, 2016, in the Court of Common Pleas of Allegheny County, which involuntarily terminated his parental rights to his minor daughter, Z.J. ("Child"), born in March of 2010.[1]  After careful review, we affirm.

The orphans' court summarized the relevant factual and procedural history of this matter as follows.

> The child was initially referred to [the Allegheny County Office of Children, Youth and Families ("CYF")] in May 2010 [due to] allegations that Mother had refused to get [] medical treatment for the newborn child.  Moreover, the Mother was no

---

[*] Former Justice specially assigned to the Superior Court.
[1] The parental rights of Child's mother, H.M.M. ("Mother"), were terminated by the same order.  Mother has not filed a brief in connection with this appeal, nor has she filed her own separate appeal.

longer allowed to reside with relatives after they accused her of stealing. Mother was alleged to have unaddressed drug and alcohol concerns. She had three other children outside of her care. Father was incarcerated at the Allegheny County Jail. The child was removed from Mother's care and placed with the maternal grandmother. But after services were installed, the Mother was able to resume custody of [Child] in June and the case was closed four months later in September.

The child came to the attention of the agency again in January 2013 upon allegations that Mother was drinking and driving with [Child] and other children in her car and that Mother was not diligent in providing her children with necessary medical care. Like the last time the child was removed, Father was not in the home. Instead, he was living in Renewal, a halfway house following his release from the Allegheny County Jail. [Child] was returned to her Mother in October 201[3], but then removed for a third time in January 2014. Mother had been arrested for drunk driving; [Child] and other children had been in the car without seatbelts.

Family Service Plans ("FSPs") were created for both parents to address the issues that seemingly prevented them from providing adequate parental care. The FSPs were identical for both parents. The goals included: follow the terms of probation; achieve and maintain recovery from substance abuse; ensure that the children attend and perform satisfactorily in school; eliminate domestic violence; ensure supervision of the children; ensure the children have medical care; maintain contact and cooperation with the agency and visit with their children; [and] attend[] [a] parenting program. . . .

Father was also largely noncompliant with his FSP goals. He was incarcerated in 2010 and was living in the Renewal halfway house in 2013. He has never been compliant with his drug and alcohol goal; he refused to take drug screens, and in 2013 the children told authorities that he grew marijuana in the home. Father has never attended any medical appointments or any school meetings. Although he was probably not given notice of such things, it is also clear that he did not ask. Father has never provided any proof that he engaged in any domestic violence prevention programs. . . . Meanwhile, he did not visit consistently with the child until June 2015. Apart from his

- 2 -

stretches of incarceration, there would still be months at a time where he would not visit the child.

Father has an extensive criminal history. In 2007 he pled [guilty] to two separate cases of disorderly conduct. In 2008 he pled guilty to criminal conspiracy, felony manufacture and delivery with intent, and receiving stolen property. In 2011 he was found guilty of terroristic threats, simple assault and resisting arrest.

Father testified that he was in the home of the child until she was approximately a year old, at which time he was incarcerated. He was released to the halfway house when the child was two and a half. But he left without permission and was eventually arrested six weeks later in March 2013. He served another six months until he was released to another halfway house. Again he left without permission and was arrested again and incarcerated again in January 2015. He was incarcerated until June 25, 2015. . . .

Orphans' Court Opinion, 7/5/2016, at 1-3 (citations to the record and footnote omitted).[2]

On March 10, 2015, CYF filed a petition to involuntarily terminate Father's parental rights to Child. CYF then filed a motion to withdraw its termination petition on October 5, 2015, which the orphans' court granted.[3] CYF filed a second petition to terminate Father's parental rights on January 25, 2016. The orphans' court held a termination hearing on April 4, 2016,

_____

[2] Child was adjudicated dependent as to Mother on January 28, 2013, and adjudicated dependent as to Father on March 24, 2014. N.T., 5/4/2016, at 42.

[3] In its motion, CYF averred that Child's maternal grandmother, who is also her foster mother, no longer wanted to adopt Child and instead wanted to be Child's permanent custodian. Child's grandmother later changed her mind, and again wants to adopt Child.

and May 4, 2016, during which the court heard the testimony of psychologist, Terry O'Hara, Ph.D.; family service transporter, Milton L. Butts, Jr.; Child's maternal grandmother, S.M.; CYF caseworker, Terese Tuminello; and Father. Following the hearing, on May 5, 2016, the court entered an order involuntarily terminating Father's parental rights to Child. Father timely filed a notice of appeal on June 2, 2016, along with a concise statement of errors complained of on appeal.

Father now raises the following issue for our review.

Did the [orphans' c]ourt commit fatal and reversible error and/or abuse[] its discretion by ruling that [CYF] proved by clear and convincing evidence that terminating the parental rights of Father, [] best meets the needs and welfare of his minor child [Child] pursuant to 23 Pa[.]C.S.A. [§] 2511(b)?

Father's brief at 1.

We consider Father's claim mindful of our well-settled standard of review.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the orphans' court terminated Father's parental rights pursuant to Sections 2511(a)(2), (5), (8), and (b). Father presents no argument in his brief with respect to Section 2511(a). Thus, any challenge to Section 2511(a) is waived, and we need only consider whether the court abused its discretion by terminating Father's parental rights pursuant to Section 2511(b). *See In re W.H.*, 25 A.3d 330, 339 n.3 (Pa. Super. 2011), *appeal denied*, 24 A.3d 364 (Pa. 2011) (quoting *In re A.C.*, 991 A.2d 884, 897 (Pa. Super. 2010)) ("'[W]here an appellate brief fails to provide any

discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived."').

Section 2511(b) provides as follows.

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b).

This Court has explained our analysis with respect to Section 2511(b) in the following manner.

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
>> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court

- 6 -

> stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)) (quotation marks and citations omitted).

Here, the orphans' court concluded that terminating Father's parental rights would best serve Child's needs and welfare. The court acknowledged that Child and Father have a positive relationship. Orphans' Court Opinion, at 7/5/2016, 5-6. Nonetheless, the court found that Father has never been a consistent caretaker for Child, and that "this positive relationship has occurred in spite of Father's behavior not because of it." *Id.* at 6. The court further observed that Child has a secure attachment with her maternal grandmother and that Child has thrived in her care. *Id.* The court emphasized the testimony of psychologist, Terry O'Hara, Ph.D., who opined that Child's need for stability, safety, and security, outweigh whatever detriment Child might experience if Father's parental rights are terminated. *Id.*

Father argues that CYF failed present clear and convincing evidence that terminating his parental rights would best serve Child's needs and welfare. Father contends that Dr. O'Hara "arrived at his opinion in part based on collateral information that was not true or was taken out of context." Father's brief at 6. Specifically, Father contends that Dr. O'Hara

relied on negative and allegedly false statements made to him by Child's maternal grandmother.[4]  *Id.* at 6-8.  Father also asserts that Dr. O'Hara based his conclusions on "partial information he received from Father from fifteen (15) years prior when Father was a juvenile."  *Id.* at 8-9.  Finally, Father claims that the orphans' court failed to conduct a sufficient analysis on how terminating Father's parental rights will impact Child.  *Id.* at 15-17.

After carefully examining the record in this matter, we conclude that the orphans' court did not abuse its discretion by involuntarily terminating Father's parental rights to Child.  During the termination hearing, Dr. O'Hara testified that he conducted an interactional evaluation of Father and Child, as well as an individual evaluation of Father and two interactional evaluations of Child and her maternal grandmother.  N.T., 4/4/2016, at 15, 22, 38.

With respect to Child's interactional evaluation with Father, Dr. O'Hara testified that Father "interact[ed] well" and "showed some positive parenting skills with his daughter."[5]  *Id.* at 38.  Dr. O'Hara also observed that Child displayed characteristics of a positive attachment with Father.  *Id.* at 38,

_____

[4] These statements include allegations by Child's maternal grandmother that Father says negative things about her and Mother during his visits with Child, that Father told Child to tell Dr. O'Hara that she wants to live with him, and that Father is unemployed.  *See* Father's brief at 7-8.

[5] Dr. O'Hara testified that Father displayed parenting deficits as well.  N.T., 4/4/2016, at 38-39.  Dr. O'Hara explained that Father spoke "very negatively" about Mother in Child's presence, and that Father's comments appeared to make Child upset.  *Id.* at 39-41.

41-42. Child "referred to him as daddy, . . . she smiled with her father and praised him. She showed affection to him. She excitedly interacted with him. She was compliant to [Father]. She made a statement something to the effect of, 'It's fun when you're around me.'" *Id.* at 38. Dr. O'Hara opined that Child has a beneficial relationship with Father, and that "there would certainly be some psychological harm" if Child's contact with Father were to cease. *Id.* at 46, 92.

However, Dr. O'Hara expressed concern regarding Father's extensive criminal record. Dr. O'Hara reported that Father has a history of convictions dating back to 2007. *Id.* at 32. Most recently, Dr. O'Hara believed that Father was "on the run" from police for a period of about two years, from 2013 until 2015, due to violating the conditions of his probation or parole.[6] *Id.* at 33. Father also reported to Dr. O'Hara that he has a history of juvenile delinquency. *Id.* at 30. Father informed Dr. O'Hara that he "was placed at Harborcreek for four years . . . . It was sometime, I believe, around 11 and 12 years of age until then 15 or 16." *Id.* at 26-27. Based on Father's lengthy history of engaging in criminal activity, Dr. O'Hara diagnosed Father with antisocial personality disorder. *Id.* at 30.

---

[6] Father testified that he absconded from a halfway house on January 27, 2013. N.T., 4/4/2016, at 113. Father recalled that he was arrested on March 11, 2013, and was incarcerated for six months due to absconding. N.T., 4/4/2016, at 113, 117-18. Father then went "on the run for a year and a half" from September 11, 2013, until January 8, 2015. *Id.* at 116.

Dr. O'Hara further testified that Child appears to be doing very well in the care of her maternal grandmother. *Id.* at 20. Dr. O'Hara explained that Child's grandmother demonstrated "significant" parenting abilities during her interactional evaluations with Child. *Id.* at 16-17. Child also exhibited several factors indicative of a "secure attachment" with her grandmother. *Id.* at 16-18. For example, during her second evaluation with her grandmother in February of 2016, Child stated that her grandmother is "kind and nice," that she loves her grandmother, that she is best cared for by her grandmother, and that she would like to continue living with her grandmother. *Id.* at 17-18.

Ultimately, Dr. O'Hara opined that Child's needs and welfare would best be met by being adopted by her maternal grandmother. *Id.* at 43. Dr. O'Hara emphasized the security and stability provided by Child's grandmother and explained, "When I look at [Father's] level of criminal activity, which includes assault and aggression and violence and then also being on the run for two years, . . . I just don't have evidence that [Father] is able to refrain from criminal activity for a sustained amount of time." *Id.* at 42-43. While Dr. O'Hara recommended an open adoption if possible, he believed that the benefits of adoption would outweigh any harm that Child might experience even if she is not able to maintain a relationship with Father. *Id.* at 43-44.

Thus, the record supports the finding of the orphans' court that terminating Father's parental rights will best serve Child's needs and

welfare. At the time of the termination hearing in this matter, Child was six years old, and had been in foster care continuously for nearly two and half years. Further, Child has a positive relationship with her maternal grandmother, and is thriving in her care. While the record indicates that Child and Father also exhibit a positive relationship, it is clear that this relationship is outweighed by Child's need for permanence, safety, and stability. As this Court has stated, "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." **In re Adoption of R.J.S.**, 901 A.2d 502, 513 (Pa. Super. 2006).

Additionally, we reject Father's claim that the orphans' court abused its discretion by accepting the testimony of Dr. O'Hara. First, our review of the record belies Father's assertion that Dr. O'Hara's conclusions were influenced by negative and allegedly false statements made to him by Child's maternal grandmother. When explaining why he believed that Child should be adopted by her grandmother, Dr. O'Hara said nothing about the grandmother's statements concerning Father. Instead, Dr. O'Hara emphasized the security and stability that Child's grandmother provides, as well as Father's lengthy criminal history. The statements made by Child's grandmother appear to have had, at best, a minimal impact on Dr. O'Hara's

conclusions. Even if Dr. O'Hara had placed significant weight on the statements made by Child's grandmother, it was for the orphans' court, not this Court, to assess the veracity of those statements, as well as the credibility and weight to be given to Dr. O'Hara's testimony. *See In re T.S.M.*, 71 A.3d at 267.

For the same reasons, we reject Father's claim that Dr. O'Hara's conclusions were based on incomplete information regarding Father's juvenile criminal record. During the termination hearing, Dr. O'Hara explained that he took Father's juvenile record into account when diagnosing Father with antisocial personality disorder, as this diagnosis "supposes a pervasive pattern of disregard for the violation of rights in others since 15 years of age." N.T., 4/4/2016, at 104. However, Dr. O'Hara does not appear to have relied significantly on Father's juvenile record when making his ultimate recommendation that Child should be adopted by her maternal grandmother. To the contrary, it was Father's recent criminal activity that Dr. O'Hara emphasized when explaining why he believed that Child should be adopted. The record confirms that Father's criminal history as an adult is quite extensive, and this history by itself amply supports Dr. O'Hara's opinion that Father is simply too prone to recidivism to serve as an appropriate parent for Child.

Accordingly, because we conclude that the orphans' court did not abuse its discretion by involuntarily terminating Father's parental rights to Child, we affirm the order of the orphans' court.

Order affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/18/2016