J-S34013-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN THE INT. OF: K.E.E., A MINOR | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: K.S., BIOLOGICAL MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 564 MDA 2020 |

Appeal from the Decree Entered October 4, 2019
In the Court of Common Pleas of Tioga County
Orphans' Court at No(s):  17-OC-2019

| IN THE INT. OF: N.L.S., A MINOR | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: K.S., BIOLOGICAL MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 565 MDA 2020 |

Appeal from the Decree Entered October 4, 2019
In the Court of Common Pleas of Tioga County
Orphans' Court at No(s):  18-OC-2019

BEFORE:  PANELLA, P.J., BENDER, P.J.E., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY PANELLA, P.J.: **FILED SEPTEMBER 08, 2020**

K.S. ("Mother") appeals from the decrees entered October 14, 2019, that granted the petitions of the Tioga County Department of Human Services ("DHS" or "the Agency"), and involuntarily terminated her parental rights to

her daughters, K.E.E. (born September 2012) and N.L.S. (born April 2015) (collectively, "Children" or "the Children").[1], [2]  After careful review, we affirm.

On January 3, 2018, Tioga County DHS petitioned for Emergency Protective Custody of the Children.  *See* N.T., 6/25/19, at 17-18.  DHS had received a report that two-and-a-half-year-old N.L.S. was hospitalized in the Intensive Care Unit ("ICU") at Golisano Children's Hospital in Rochester, New York.  *See id*.  N.L.S. had suffered extensive second and third-degree burns.  *See id*.

When interviewed, Mother stated that she had picked up N.L.S. from daycare early on December 27, 2017, because N.L.S. was not feeling well.  *See id*. at 19.  After N.L.S. refused dinner, Mother claimed that she put N.L.S. into a bath with her two siblings and that, when she went to bed at seven o'clock, N.L.S. was fine.  *See id*.  When N.L.S. woke up the next morning, she had a blister-like rash, so Mother took N.L.S. to the hospital.  *See id*.

However, hospital staff informed caseworkers that Mother had sent text message pictures of N.L.S. to L.S. ("Grandmother"), the paternal grandmother of N.L.S.'s half sibling G.S., asking about the injuries.  *See id*. at 19.

_____

[1] Both K.E. (K.E.E.'s father) and J.M.Z. (N.L.S.'s father) consented to the termination of their parental rights. Neither father has appealed, nor participated in the instant appeal.

[2] A third child, G.S., was also removed from the home.  N.T., 2/6/18, at 48-49.  G.S. is the half-brother of N.L.S. and K.E.E. and is not a subject of the instant termination.  *See id*.  G.S. was placed in the custody of his father, G.S., and remained in his father's custody as of the time of the termination hearing.  N.T., 5/22/18, at 7.

Grandmother told Mother to go to the hospital, but Mother stated that she did not want to take N.L.S. because the child was not crying. *See id*.

A ChildLine report was made; the CPS investigation was transferred from Steuben County, New York, where Mother had claimed to live, to Tioga County, Pennsylvania, where Mother actually lived. N.T., 1/3/18. at 7. At the conclusion of the hearing, the orphans' court granted DHS legal and physical custody of N.L.S. and K.E.E., and both Children were placed in foster care. *See id*. at 8.

DHS filed a petition seeking to have the Children declared dependent. Following an extensive hearing on February 6, 2018, which included testimony from a doctor who had examined N.L.S. at the hospital, the Children were adjudicated dependent.[3] N.T., 2/6/18, at 1-133. Additionally, the orphans' court made a finding of aggravated circumstances due to the fact that N.L.S. had been a victim of a child abuse. *See id*. at 58, 130-32. The orphans' court held permanency review hearings in May 2018, September 2018, December 2018, and May 2019.[4]

_____

[3] At the adjudicatory hearing, color photographs of N.L.S.'s second- and third-degree burns were admitted, without objection, as Agency Exhibit 1. N.T. 2/6/18, at 11. Additionally, the parties stipulated to the admission of records from the Monroe County, New York, Department of Human Services, as Agency Exhibit 2. *See id*. at 47. Text messages between Mother and Grandmother on the night N.L.S. suffered her injuries were introduced as Guardian Exhibit 1. *See id*. at 80.

[4] The permanency review orders are not contained within the exhibits entered at the termination hearing.

On March 5, 2019, DHS filed petitions to involuntarily terminate the parental rights of Mother to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). DHS filed amended petitions on June 21, 2019, incorporating grounds pursuant to 23 Pa.C.S.A. § 2511(a)(9), following Mother's conviction on April 23, 2019 of aggravated assault and endangering the welfare of N.L.S.[5] **See** N.T., 6/25/20, at 23-24.

In June 2019, July 2019, and August 2019, the orphans' court conducted evidentiary hearings on the petitions. DHS presented the testimony of Clara Holley, Brandi Greene, Barbara Short, Ashley Kohler, foster mother A.L., Grandmother, and Dr. Denise Feger, who performed the bonding assessments. Mother, represented by counsel, was present at the hearings and testified on her own behalf. Mother presented the testimony of Constance Gunn, Mother's parents J.S. and B.S., godmother S.W., and family friend S.W. The Children were represented by Lenore M. Urbano, Esquire, as guardian *ad litem*, and Anne K. Leete, Esquire, as legal counsel. Attorney Urbano presented the testimony of Stephanie Brostrom, a case aid with family services in Rochester, New York.

Clara Holley testified that she is a specialized caseworker for Service Access and Management ("SAM"). N.T., 6/25/19, at 8. Holley worked with Mother weekly in Tioga County Prison since May 2019; prior to May, other

---

[5] Mother was sentenced, on July 16, 2019, to fourteen to sixty months of imprisonment for aggravated assault and a concurrent term of imprisonment of fourteen to sixty months for endangering the welfare of a child.

caseworkers from SAM assisted Mother. *See id*. at 8-9. Mother's goals and objectives were working on parenting; engaging in age-appropriate discipline; finding employment upon release from prison; and securing housing. *See id*. at 9. Mother was inconsistent with regard to her cooperation; some weeks she was cooperative, but other weeks she would not speak to Holley, who would have to leave the prison. *See id*. at 10-13. Holley found that Mother made some progress, but not enough to close services. *See id*. at 11.

Brandi Greene testified that she is a placement supervisor employed by SAM. *See id*. at 17-18. Greene was one of two initial caseworkers who went to Rochester, New York, to meet Mother at the hospital and take emergency custody of the Children. *See id*. at 18. DHS had applied for emergency custody after Mother had refused to allow hospital workers to administer pain medication for N.L.S.'s burns. *See id*. at 19.

Mother at first claimed that N.L.S. was fine when she went to bed. *See id*. However, hospital staff informed Greene that Mother had texted Grandmother about N.L.S.'s "rash" the night before and was told to go to the hospital. *See id*.

Mother remained steadfast in her belief that N.L.S. was not in pain. *See id*. N.L.S. was hospitalized from December 28, 2017, until January 24, 2018. *See id*. at 20. After N.L.S. was released from the hospital, Greene continued to work with Mother. *See id*. at 21. Mother continued to give inconsistent stories -- at least seven or eight explanations -- regarding N.L.S.'s injury, and refused to accept that the injury was thermal burns. *See id*. at 21-22, 43.

Mother was recommended for a variety of services, including psychological counseling; trauma assessment; parenting education; visitation; and mental health services. *See id*. at 24. Mother did undergo mental health services for a period of time in 2018. *See id*. at 24-25, 34. Mother did not complete parenting education. *See id*. at 33-34. Mother participated regularly in visitation. *See id*. at 26.

However, after Mother was incarcerated, she became uncooperative and noncompliant. *See id*. at 29. Additionally, visitation workers reported several concerning incidents with Mother. *See id*. at 30.

During one visit, Mother shut N.L.S.'s arm in the door and N.L.S. began to cry. *See id*. Mother told her to "stop crying and being a baby." *Id*. When staff tried to redirect Mother, Mother rolled her eyes and ignored them. *See id*.

In another incident, Mother and N.L.S. were in a bathroom stall with staff outside. *See id*. There was a smacking noise and N.L.S. began to scream and cry, but Mother denied that anything had happened. *See id*. In February or March, N.L.S. spilled a drink, and Mother got up, pulled N.L.S.' chair out from beneath her, and N.L.S. fell onto the floor. *See id*. at 30-31.

Barbara Short testified that she is a clinical social worker for Family Life Ministries, and provides counseling, specializing in trauma. *See id*. at 48. Short began seeing Mother in July 2018 and ceased seeing Mother in December 2018 when Mother stopped coming to appointments. *See id*. at 49. Mother did send some updates to Short through text messages, but Short

testified that she prefers to limit text contact with clients. *See id*. Short testified that Mother did not understand why the Children were taken away, and continued to present N.L.S.'s injuries as "some redness to her skin." *Id*. at 50-51.

Stephanie Brostrom testified that she is a case aide with Family Services, and supervised four five-hour long visits at the hospital with Mother and N.L.S. in January 2018. N.T., 8/22/19, at 57. Brostrom testified that during the first visit, N.L.S. was in agony due to the burns and required sedation. *See id*. at 57. During the visit, N.L.S. was wearing a net shirt over her dressings which required changing, and was in such pain that she threw up. *See id*. Mother was standing next to the crib while hospital staff changed N.L.S.'s dressings and was completely emotionless and seemed unbothered by N.L.S.'s pain. *See id*. at 58.

At another visit, a doctor came in to explain the procedures and skin grafts to Mother, who had her phone in her hand and would not acknowledge that the doctor was in the room. *See id*. at 58. J.S., Mother's father, was in the room as well asking questions, including whether the doctor thought the burns were chemical in nature. *See id*. The doctor replied that the burns were thermal. *See id*.

During another visit, Mother held N.L.S. in her arms. *See id*. N.L.S. would settle as long as Mother did not move, but Mother continued to move and N.L.S. would cry. *See id*. Mother had no visible reaction to N.L.S.'s tears. *See id*. Brostrom testified that the only time Mother was visibly upset was as

the second visit was ending, N.L.S. woke up and said, "Mommy, please don't leave." *Id*. at 59. Mother teared up, but turned around and left. *See id*. Brostrom observed that for much of the visits, Mother was on her phone while her parents were interacting with N.L.S., and did not pay attention to the child at all. *See id*. at 59.

Ashley Kohler testified that she is a caseworker employed by Tioga County DHS. N.T., 6/25/19, at 54. Kohler is the Children's caseworker, and both K.E.E. and N.L.S. are doing well in their placements. *See id*. at 54-55. N.L.S. is placed with foster mother A.L., and K.E.E. is placed with Grandmother. *See id*. at 54. K.E.E., N.L.S., and G.S. are able to have visits at Grandmother's house. *See id*. at 55.

Kohler testified that one of the objectives of Mother's family service plan was that Mother be able to articulate the reason the Children were placed into care and avoid any further abuse of the Children. *See id*. at 57-58, 62. Mother was never able to do that, and continued to provide different stories, including that she had put all three children into the bath, or that the injury was a chemical burn caused by body wash. *See id*. at 58. Mother never acknowledged that N.L.S. was injured by thermal burns. *See id*.

Another goal of the family service plan was for Mother to improve childcare knowledge and household management. While Mother brought appropriate food to visits, she utilized inappropriate discipline at the visits. *See id*. at 61.

Kohler testified that Mother told her that, as of February 2019, she was still attending mental health treatment. *See id*. at 62. However, when Kohler contacted Short, it became clear Mother had stopped attending therapy in December 2018. *See id*. at 62-63. Mother did not attend the majority of the Children's medical or dental appointments, though she was aware of them. *See id*. at 64.

Kohler also testified that during the bonding assessment conducted in February 2019, N.L.S. did not seem interested in interacting with Mother. *See id*. at 60. Mother then watched K.E.E. play a game on her cellphone. *See id*. Once the bonding assessment was over, N.L.S. left in hysterics, crying that she did not want Mother to leave, but that she wanted Mother to come with her to "mommy's house," meaning her foster mother. *Id*.

Kohler observed N.L.S.'s interactions with her foster mother, A.L., and they are warm and appropriate; foster mother can easily redirect N.L.S., and N.L.S. enjoys cuddling with foster mother. *See id*. at 73-74. K.E.E. loves to play with her resource parents and joke around. *See id*. at 74. She calls G.S.'s father "daddy" when he is at the house. *Id*.

Both of the Children expressed a desire to live with Mother, however, they also communicated a desire to live with their current caregivers. *See id*. at 74-75. K.E.E. stated to Kohler that, "Mommy told me if I tell you [I want to live with her] enough times you'll let me go home." *Id*. at 75. N.L.S. told Kohler that she likes her home with A.L. and the pets she has there. *See id*. at 76. When asked to make a "child circle," most of N.L.S.'s connections were

A.L.'s family members. *See id*. The Agency's recommendation was to terminate Mother's parental rights to both of the Children. *See id*. at 64.

A.L. testified that she is N.L.S.' foster mother, and that N.L.S. has been in her care for the last eighteen months. N.T., 7/13/19, at 55. At the time of the hearing, N.L.S. had continuing complex medical needs that would require steroid injections into her skin graft sites to decrease the scar tissue. *See id*. at 61. This is a painful procedure that would require twilight sedation or general anesthesia. *See id*. N.L.S. still requires an uncomfortable compression garment to minimize scarring. *See id*. at 62. N.L.S. will require continuing treatment as she grows and the scars change, and she could still develop hypersensitivity. *See id*. N.L.S. will need to engage in scar management throughout her life. *See id*.

A.L. testified that N.L.S. is thriving and loves to talk to learn and talk to people. *See id*. at 55-56. N.L.S. calls A.L. "mom" or "mommy" and A.L.'s sister "True Love." *Id*. at 56, 58. A.L. stated that at times, when N.L.S. was picked up for visits with Mother, she would say that she didn't want to go and ask whether she would be coming back to A.L. *See id*. at 59. A.L. testified regarding her desire to adopt N.L.S. and her intentions to continue N.L.S.'s relationship with her siblings. *See id*. at 56-57.

Grandmother testified that she is G.S.'s grandmother and K.E.E.'s foster mother. *See id*. at 64. As of the date of the hearing, K.E.E. is doing well in her placement; she is social and has many friends at school. *See id*. at 64-65. K.E.E. has been integrated into Grandmother's extended family and loves

seeing them. *See id*. at 65. She calls Grandmother "Grandma" and Grandmother's husband "Papa." *See id*. at 66. It is Grandmother and Grandfather's intent to adopt K.E.E. *See id*. They also wished to adopt N.L.S. *See id*.

Dr. Denise Feger testified that she evaluated K.E.E. and N.L.S. N.T., 8/22/19, at 65. In the course of her evaluation, she spoke with Mother and caseworkers from DHS. *See id*. Dr. Feger did not make a diagnosis for K.E.E., who was "doing quite well," although she was struggling with sadness and missing her mom. *See id*. at 65-66. K.E.E shared that she knew N.L.S. was burned because her mother had put her in the tub, but there was little detail around the disclosure. *See id*. at 66. Dr. Feger recommended that K.E.E. participate in outpatient mental health services to address any confusion she had regarding her relationship with her mother and current caregiver. *See id*.

With regard to N.L.S., Dr. Feger noted that because of her age and length of time in care, she identified her foster mother as her primary caregiver. *See id*. at 67. N.L.S. referred to A.L. as "mom one" and Mother as "mom two." *Id*. Dr. Feger did not give N.L.S. a diagnosis either because there was "so very much in a place of transition at that time." *Id*. at 68. Dr. Feger's biggest concern was the "limbo" that the Children were in was having an emotional effect on them. *Id*. She suggested play therapy for N.L.S. to assist her in developing coping skills. *See id*. Dr. Feger recommended that permanency be granted to the Children with therapeutic intervention to

support them in having a clear understanding of their future, regardless of whether that was termination or reunification. *See id*. at 69.

After a bonding evaluation, Dr. Feger noted that both of the Children had a bond with Mother and did not appear fearful or reluctant to interact with her. *See id*. at 72. Both of the Children indicated a desire to live with Mother, but also, a desire to stay with their current caregivers. *See id*. at 80-81. If termination was granted, Dr. Feger opined that the Children would struggle with the loss of their mother in her capacity as a mother, but not a primary caregiver, as they view both foster parents as their primary caregivers. *See id*. at 72, 78.

Dr. Feger also evaluated Mother. *See id*. at 72. She diagnosed Mother with acute stress disorder due to the events that had taken place, and recommended outpatient mental health treatment so Mother could better manage her stress-related symptoms. *See id*. at 73-74.

Mother testified that, prior to her incarceration, she lived in Tioga, Pennsylvania. Before that she lived in Campbell, New York, for sixteen years. *See id*. 14-15. Mother testified that she has three older children with her ex-husband, B.R., who live with their father and grandmother. *See id*. at 17-18.

In contrast, Mother testified that K.E.E., N.L.S., and G.S had always lived in her home and were never apart from her for any significant time. *See id*. at 22-23. Prior to her conviction for aggravated assault, Mother had not been charged with any crimes, although she had had issues with Children and Youth Services in Steuben County, New York. *See id*. at 26-27.

At least two incidents were indicated. *See id*. at 27-28. Mother claimed that at the time of N.L.S.'s injury she was already receiving services and counseling in New York. *See id*. at 28-29. Mother testified that since N.L.S.'s injury, she has cooperated with the required services. *See id*. at 32. Mother reiterated that she wished to remain part of the Children's lives. *See id*. at 35.

Mother claimed to have accepted responsibility for the causation of N.L.S.'s injury. *See id*. at 33-34. However, on cross examination, Mother stated that she accepted responsibility only for failing to promptly seek medical attention, not for the burns themselves. *See id*. at 52. Mother again equivocated when asked whether N.L.S. had suffered thermal burns, stating, "I'm not sure what I believe, but I don't believe that she did." *Id*. at 55.

Constance Gunn testified that she supports, teaches, and educates parents in the home. *See* N.T., 7/31/19, at 11. Gunn worked with Mother weekly as of May 2018 in her home, at a local church in Lawrenceville, Pennsylvania, and observed her spending time with the Children. *See id*. at 12-13, 29-30.

Mother completed several certificates in the parenting education program. *See id*. at 15-16. However, Mother continued to receive services up until the date of the termination hearing. *See id*. at 16. Gunn described Mother as cooperative and felt that Mother incorporated her lessons into interactions with the Children. *See id*. at 19. Gunn testified that there was a close relationship between the Children and Mother, and that the Children

did not seem to be afraid of Mother. *See id*. at 21. Gunn did not have concerns regarding Mother's ability to parent. *See id*. at 23-24. However, Gunn also stated Mother never demonstrated an understanding of the severity of N.L.S.'s injuries. *See id*. at 47.

J.S. testified that he is Mother's adopted father, and that he adopted Mother when she was eighteen months old. *See id*. at 74. The Children call him "Papa" and his wife "Nana." *Id*. at 80-81. J.S. opined that Mother loves her children and that she is a good mother. *See id*. at 75. J.S. did not believe that Mother deliberately caused harm to N.L.S., although he believed she was negligent in her response. *See id*. at 78. J.S. testified as to his fear that, if Mother's rights were terminated, the Children would lose contact with their three older half-siblings. *See id*. at 83.

B.S. testified that she is Mother's adopted mother and would hate to see the Children separated from her. *See id*. at 87. B.S. testified that Mother wants to be in the Children's lives. *See id*. at 89. Prior to N.L.S.'s injury, B.S. had no concerns about Mother's ability to raise the Children. *See id*. at 93.

S.W., the godmother of the Children, testified that she has been friends with Mother since the sixth grade. *See id*. at 98. S.W. denied being aware of any abuse or neglect by Mother. *See id*. at 100-101.

S.W. (not the same as the Children's godmother), a family friend of J.S. and B.S., testified that she has known Mother since Mother was a child and through church. N.T., 8/22/19, at 5. Mother would bring the Children to the

- 14 -

church nursery regularly. *See id*. at 5-7. S.W. testified that the Children were always clean and had no marks on their bodies. *See id*. at 7. S.W. stated that the Children were not hesitant around Mother. *See id*. at 10.

At the conclusion of the hearing, legal counsel for the Children, Attorney Leete, noted to the orphans' court that she had met individually with both of the Children. *See id*. at 88-89. She did not feel that N.L.S., at four years old, had the capacity to understand the concept of making a legal decision about her custody. *See id*.

However, based upon her observations, N.L.S. was closely bonded with her foster mother and family, and perceived her foster mother as the one who takes care of her and meets all of her needs. *See id*. N.L.S. did not identify Mother as part of her family when asked. *See id*. at 88.

K.E.E. identified Mother as her mom, but also Grandmother, Pop-Pop, and G.S. as her family that she lives with. *See id*. at 89. K.E.E. wanted to live with Mother but understood that she could not because of N.L.S.'s injury. *See id*. at 90. When asked, K.E.E. stated that she wanted to live with Mother because she missed her dog. *See id*. K.E.E. is settled in her current environment, but her expressed legal interest is to reside with Mother. *See id*.

Attorney Urbano, as guardian *ad litem*, recommended termination as being in the best interests of both of the Children. *See id*. at 91.

On October 4, 2019, the court entered decrees terminating Mother's parental rights. Mother subsequently filed petitions to appeal *nunc pro tunc*

and statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), and Notices of Appeal to this Court. After filing these documents, Mother's counsel filed petitions to withdraw as counsel.[6] After this Court directed the orphans' court to rule on the petitions for *nunc pro tunc* relief, the orphans' court granted the petitions on May 8, 2020. By order of May 11, 2020, this Court consolidated Mother's appeals.

On appeal, Mother raises the following issues for our review:

1. Did the [t]rial [c]ourt err and abuse its discretion in finding that the Department of Human Services provided by clear and convincing evidence that the conditions which led to the removal and placement of the [C]hildren were sufficient to meet [the] statutory premise of [S]ection 2511(a)[(9)] when[,] although [the] conviction had occurred[,] the appeal for said conviction had not been finalized[?]

2. Did the [t]rial [c]ourt err and abuse its discretion in finding that the Department of Human Services proved by clear and convincing evidence that the termination of Mother's parental rights was in the best interest[s] of the [C]hildren considering the bond between Mother and [the C]hildren and Mother's [role] as sole caregiver for the [C]hildren[?]

Mother's Brief at 8-9 (suggested answers omitted).

We review these claims mindful of our well-settled standard of review:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial

---

[6] Mother's termination counsel also filed an appellate brief on her behalf.

- 16 -

court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. § 2101-2938, which requires a bifurcated analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

***In re L.M.***, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). Here, the orphans' court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(9) and (b), which provide in relevant part as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

(9) The parent has been convicted of one of the following in which the victim was a child of the parent:

(i) an offense under 18 Pa.C.S. Ch. 25 (relating to criminal homicide);

(ii) a felony under 18 Pa.C.S. § 2702 (relating to aggravated assault);

(iii) an offense in another jurisdiction equivalent to an offense in subparagraph (i) or (ii); or

(iv) an attempt, solicitation or conspiracy to commit an offense in subparagraph (i), (ii) or (iii).

* * *

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent . . .

23 Pa.C.S.A. § 2511(a)(9) and (b).

There is not a wealth of case law regarding this Court's review of challenges to the sufficiency of the evidence regarding termination of a parent's rights pursuant to Section 2511(a)(9). With regard to its Section 2511(a)(9) findings, the orphans' court observed that, "the [c]ourt has taken judicial notice of [Mother's] conviction for Aggravated Assault against [one of the Children], and accordingly the [c]ourt determines grounds for termination exist." Orphans' Court Opinion, 10/4/19, at 2.

Mother does not contest that she was convicted of aggravated assault, nor does she make argument regarding the facts of the case. *See* Mother's brief at 19. Rather, Mother argues that the matter was taken up on appeal

and was awaiting "*en banc*" decision and, thus, the amended petition alleging a final conviction was premature and the court's reliance for termination was also premature.[7] *See id*.

Initially, we note

> [i]t is well-settled that this Court will not review a claim unless it is developed in the argument section of an appellant's brief, and supported by citations to relevant authority. *In re W.H.*, 25 A.3d 330, 339 n.3 (Pa. Super. 2011), *appeal denied*, 611 Pa. 643, 24 A.3d 364 (2011) (*quoting* *In re A.C.*, 991 A.2d 884, 897 (Pa. Super. 2010)) ("'[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived.'").

*In re M.Z.T.M.W.*, 163 A.3d 462, 465–66 (Pa. Super. 2017). In Mother's argument, although she cites generally to case law regarding the standards for involuntary terminations, she cites no case law to support her position and interpretation that, because her case was still on appeal, the orphans' court's Section 2511(a)(9) finding was premature. Accordingly, we deem her claim waived. *In re M.Z.T.M.W.*, 163 A.3d at 465–66. However, even if not waived, we would not find merit in her argument.

> [T]he interpretation and application of a statute is also a question of law. As with all questions of law, we must employ a de novo standard of review and a plenary scope of review to determine whether the court committed an error of law.

---

[7] We take judicial notice that Mother appealed her conviction to this Court. In April 2020, a three-judge panel of this Court affirmed Mother's judgment of sentence. In May 2020, Mother filed a Petition for Allowance of Appeal to the Pennsylvania Supreme Court. As of the date of the filing of this memorandum, no ruling had been issued as to Mother's petition to the Pennsylvania Supreme Court.

When interpreting a statute, this court is constrained by the rules of the Statutory Construction Act of 1972 (the "Act"). The Act makes clear that the goal in interpreting any statute is to ascertain and effectuate the intention of the General Assembly while construing the statute in a manner that gives effect to all its provisions. The Act provides: "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." Moreover, it is well settled that "the best indication of the General Assembly's intent may be found in a statute's plain language." Additionally, we must presume that the General Assembly *does not* intend a result that is absurd, impossible of execution, or unreasonable and *does* intend to favor the public interest over any private interest.

**G.A.P. v. J.M.W.**, 194 A.3d 614, 616–17 (Pa. 2018) (citations omitted).

Here, we are asked to interpret Section 2511(a)(9) of the Domestic Code, which states that one of the grounds for termination of parental rights is when the parent has been convicted of aggravated assault pursuant to 18 Pa.C.S.A. § 2702 as to one of their children. 23 Pa.C.S.A. § 2511(a)(9). The term "conviction" is not explicitly defined in the Act. However, this Court has previously examined the history of the term in Pennsylvania. **See Commonwealth v. Hale**, 85 A.3d 570, 578–85 (Pa. Super. 2014). The term is generally understood, for legal purposes, to refer to a judgment of sentence entered after a finding of guilt or entry of a plea. **See id**., at 582.

The legislature has indicated that it understands this meaning in at least one context. **See id**. Under 18 Pa.C.S.A. § 109, a conviction occurs when a judgment of sentence has been entered. However, that section also defines a conviction as an instance where no judgment of sentence has been entered but there is a guilty verdict or plea of guilt, so long as the reason for the lack

- 20 -

of judgment is "other than a motion of the defendant." ***Id***. While the legislature made an exception for pre-judgment motions, it did not do so for post-judgement appeals.

As a result, we conclude that for purposes of section 2511(a)(9), a conviction is understood to encompass a guilty verdict or plea that is accompanied by a sentence. When specifying that courts may terminate parental rights for convictions of certain crimes, the legislature made no mention of the appellate process. The legislature specifically did not require a final judgment of sentence, as it did in the requirements for jurisdiction to file a petition seeking Post Conviction Relief. ***See*** 42 Pa.C.S.A. § 9545. Accordingly, the Domestic Relations Code, which specifies a conviction, is not ambiguous and when "the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." ***G.A.P.***, 194 A.3d at 616-17.

Further, because we "presume the General Assembly *does not* intend a result that is absurd, impossible of execution, or unreasonable and *does* intend to favor the public interest over any private interest," we cannot conclude that the legislature intended to force orphans' courts to wait to issue termination decrees until a parent could *potentially* exhaust every avenue of appeal, a process that could take years. ***See G.A.P.***, 194 A.3d at 616-17; ***see***, ***e.g.***, ***In re Adoption of R.J.S.***, 901 A.2d 502, 513 (Pa. Super. 2006) (recognizing that a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities).

Accordingly, the court did not abuse its discretion in concluding that DHS had introduced clear and convincing evidence sufficient to find that Mother had been convicted of aggravated assault of N.L.S. such that the requirements of the statute were satisfied. *See L.M.*, 923 A.2d at 511; 23 Pa.C.S.A. § 2511(a)(9).

Mother next argues that the court erred in terminating her parental rights because it was not in the best interests of the Children. Specifically, Mother argues that there was a bond between her and the Children, and the facts were undisputed that Mother had acted as a primary caregiver prior to the incident, and had provided the Children with a safe, stable home. *See* Mother's brief at 20-31.

Mother's argument challenges the orphans' court's conclusion under 23 Pa.C.S.A. § 2511(b).

> . . . Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated

that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (*quoting*

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (quotation marks and

citations omitted).

A parent's abuse and neglect are likewise a relevant part of this analysis:

[C]oncluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent. . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a de facto beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and its mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and

quotation marks omitted).

The court found that while K.E.E. had a bond with Mother, termination

still served K.E.E.'s best interests:

In this matter, the [c]ourt took judicial notice of the dependency court proceedings and records. During the dependency proceedings, [DHS] established that [Mother] failed to obtain immediate medical care for [N.L.S.], only taking her to the hospital the morning after the injuries occurred. [Mother] also failed to participate, in any meaningful way, in [Child's] post-hospitalization treatment, including skin graft procedures, follow-appointments, and therapy intended to ease pain and manage or limit scarring.

- 23 -

[K.E.E.] has been in Kinship placement with [Grandmother and Grandfather] since her removal from [Mother's] care. The Kinship home has expressed a willingness to provide permanency to [K.E.E.] through adoption. The Kinship home has provided for all needs of [K.E.E.] since her placement. The Kinship home has participated in her medical and dental care, attended and support[ed] her educational needs and activities. Further, the Kinship home has continued to support [K.E.E.]'s contact with her biological siblings. [Mother] has not been meaningfully engaged in [K.E.E.]'s medical, educational, or emotional development.

[K.E.E.] is aware of and identifies [Mother] as her mother. Contact between them has occurred only during supervised visits. [K.E.E.] identifies her resource home as her own and has formed connections and bonds with other members of the resource parent's family, and participated in the normal activities of the family life with them.

[Mother] is currently incarcerated in the State Correctional System for an indeterminant term between fourteen (14) and sixty (60) months for her convictions in the criminal case involving [N.L.S.]. This fact, though not determinative, has been considered by the [c]ourt as directly and significantly impacting [the Children's] right to permanency. Prior to her incarceration, [Mother] participated in supervised visits with [the Children], and had never progressed to either semi or unsupervised visits during the time the dependency action was open. It is unknown when [Mother] will be paroled and even more uncertain when progress would warrant more extensive visitation.

What is absolutely certain is that [K.E.E.,] having been in the care of [DHS] for nearly two years now, is entitled to permanency. Permanency in this case is not only [K.E.E.]'s right, but serves her best interest both immediately and long-term. Permanency may be accomplished for [K.E.E.] by the termination of [Mother's] parental rights. The [c]ourt recognizes termination will sever the bond [K.E.E.] has with [Mother,] and that this may well require extra support or services, however, it will serve [K.E.E.]'s long-term emotional and developmental best interests.

Orphans' Court Opinion, 10/4/19, at 2-4.

The court's analysis of N.L.S.'s best interests was nearly identical to its analysis of K.E.E.'s best interests, with the exception of the following paragraphs regarding N.L.S.:

The responsibility for managing [N.L.S.'s] therapy and care has been placed upon the resource (foster) parent. The resource parent has, under the supervision of [DHS,] attended to all of the medi[c]al, emotional, and developmental needs of [N.L.S.] since her initial release from the hospital in January, 2018. [N.L.S.] is aware of the status of [Mother] as her mother and can identify her as such, but has contact with her only during supervised visits. [N.L.S.] also identifies her resource parent as her mother and has formed connections and bonds with other members of the resource parent's family, and participated in the normal activities of the family life with them. [N.L.S.] identifies the resource home as her own.

The resource family has been identified as an adoptive family and has expressed a willingness to proceed with an adoption. The resource family has sufficient resources and desire to meet [N.L.S.'s] long-term needs.

Orphans' Court Opinion, 10/4/19, at 2-4.

The record supports the court's conclusions and reflects that, despite the hardship and injury suffered by the Children, they still have a bond with Mother. *See* N.T., 6/25/19, 74-75. The court acknowledged that K.E.E. expressed a desire to return to Mother's care. *See id*. However, there was some testimony that Mother was attempting to influence the Children to request a return to her care, as well, with K.E.E. stating to Kohler that, "Mommy told me if I tell you [I want to live with her] enough times you'll let me go home." N.T., 6/25/19, at 75. Furthermore, both Children also identify their resource families as their primary caregivers and N.L.S., specifically,

identifies A.L. as her mother and is strongly bonded to her, as well. N.T., 8/22/19, at 68.

The testimony further established that during N.L.S.'s hospitalization, Mother was not involved in N.L.S.'s care and did not seem to be concerned that the child was in agonizing pain. *See* N.T., 8/22/19, at 57-60. By contrast, A.L., N.L.S.'s foster mother, has spent the last eighteen months assisting N.L.S. with both her painful scar treatment and management, which will likely continue for the rest of N.L.S.'s life. *See* N.T., 7/13/19, at 55-61.

The court was also entitled to be concerned with Mother's failure to accept responsibility for N.L.S.'s injuries. When asked directly whether she believed N.L.S. had suffered thermal burns, Mother stated, "I'm not sure what I believe, but I don't believe that she did." N.T., 8/22/19, at 55. Additionally, there was testimony which established the Agency's concerns that Mother continued to use inappropriate care and discipline towards N.L.S. during visits. N.T., 6/25/19, at 30-31.

The testimony of Dr. Feger further establishes the Children's requirement for permanency, noting that the length of time the Children were "in limbo" could be harming them emotionally, and that both of the Children were confused with regard to their relationship with Mother and primary caregivers. N.T., 8/22/19, at 68. Dr. Feger recommended that permanency be granted to the Children with therapeutic intervention to assist them in navigating their emotions. *See id*. at 69.

The credited testimony supports the orphans' court's conclusion that it would best serve the needs and welfare of the Children to terminate Mother's parental rights pursuant to Section 2511(b).  Preserving Mother's parental rights would serve only to deny the Children the safety, permanency, and stability to which they are entitled.  ***See In re Adoption of C.D.R.***, 111 A.3d at 1220 ("Clearly, it would not be in [the child's] best interest for his life to remain on hold indefinitely in hopes that Mother will one day be able to act as his parent"); ***see also In re K.K.R.-S.***, 958 A.2d at 535.  Accordingly, the orphans' court did not err in terminating Mother's parental rights to the Children pursuant to Section 2511(b).

Decrees affirmed.


Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 09/08/2020