J-S21030-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: D.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2900 EDA 2023 |

Appeal from the Order Entered October 25, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0001232-2020,

| | | |
|---|---|---|
| IN THE INTEREST OF: D.O.W.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 897 EDA 2024 |

Appeal from the Decree Entered October 25, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000260-2023

BEFORE: LAZARUS, P.J., NICHOLS, J., and MURRAY, J.

MEMORANDUM BY NICHOLS, J.: **FILED SEPTEMBER 10, 2024**

M.B. (Mother) appeals from the orders involuntarily terminating her parental rights to D.B. (Child), then aged eleven, who was born in May of 2012, and changing D.B.'s permanency goal to adoption.[1] We affirm.

---

[1] Mother appeals two orders, one issued in Child's case in the juvenile court's dependency docket, and the other in Child's case in the juvenile court's
*(Footnote Continued Next Page)*

In lieu of a Rule 1925(a) opinion, the juvenile court directs our attention to the hearing transcript of October 25, 2023, to identify its reasons for these orders. Trial Ct. Rule 1925(a) Notice, 12/4/23, at 1-2. The following facts and procedural history are gathered from our review of the record.

### Facts and Procedural History

On November 18, 2020, while traveling on public transportation *en route* from Maryland to New York with Child and Mother's paramour, Mother suffered a mental health crisis in Philadelphia, Pennsylvania, which resulted in the police transporting Mother to a psychiatric hospital. N.T., 10/25/23, at 15-16, 23-29, 48-49.[2] Consequently, Child was left without parental care or supervision and the police took Child, then aged eight, into custody. *Id.* Mother testified that on November 18, 2020, she had a manic-depressive episode and that prior to this event Mother and Child had resided in Baltimore, Maryland. *Id.* at 16-18, 26-27. The Philadelphia Department of Human

_____

adoption docket. *See* Trial Ct. Orders, 10/25/23 in No. CP-51-DP-1232-2020 (dependency) and No. CP-51-AP-260-2023 (adoption).

[2] A Community Umbrella Agency (CUA) caseworker testified that "[Child] came into [Philadelphia Department of Human Services (DHS)] custody after there was an argument between [Mother] and her paramour that she was traveling with, coming from Maryland, on her way to New York. [Mother] had a mental health breakdown. Amtrak police had to get involved, and [Mother] was 302'd at that time." N.T., 10/25/23, at 48. "302" refers to Section 302 of Article III in the Mental Health Procedures Act, 50 P.S. §§ 7301-7306, which sets forth the standards for involuntary treatment of a person believed to be "severely mentally disabled and in need of immediate treatment," and involuntary commitment of that person to an inpatient psychiatric facility. *See* 50 P.S. § 7302(a).

Services (DHS) obtained an emergency order of protective custody for Child on November 20, 2020, and on that same date the juvenile court held a shelter care hearing, granted DHS temporary custody of Child, and directed DHS to explore family members as possible foster care resources for Child. Trial Ct. Orders, 11/20/20.

On March 5, 2021, the juvenile court adjudicated Child dependent and committed Child to DHS's custody, with the goal of reunifying Child with Mother, and placed Child in foster care in Pennsylvania. Trial Ct. Order, 3/5/21, at 1-2. The juvenile court further directed DHS to assist Mother in applying for housing and Medicaid benefits, to refer Child and Mother for behavioral health services, and ordered Mother to undergo a psychiatric evaluation. *Id.* Between November 2, 2021, and January 31, 2022, DHS placed Child, through the Interstate Compact on the Placement of Children[3]

_____

[3] *See* 62 P.S. § 761. When a child dependency services agency places a child in a different state pursuant to the Interstate Compact on the Placement of Children,

> [t]he sending agency shall retain jurisdiction over the child sufficient to determine all matters in relation to the custody, supervision, care, treatment and disposition of the child which it would have had if the child had remained in the sending agency's state until the child is adopted, reaches majority, becomes self-supporting, or is discharged with the concurrence of the appropriate authority in the receiving state. Such jurisdiction shall also include the power to effect or cause the return of the child or its transfer to another location and custody pursuant to law. The sending agency shall continue to have financial responsibility for

*(Footnote Continued Next Page)*

(ICPC), with Child's maternal great aunt (Foster Mother) as a kinship foster parent in New York. Trial Ct. Orders, 11/2/21; 1/31/22, **see also** N.T., 10/25/23, at 32, 50.

At the termination and goal change hearing on October 25, 2023, Child's interests were represented by guardian *ad litem* (GAL) Angelina Dagher, Esq., and also present at the hearing was Child's legal advocate, Aaron Mixon, Esq. N.T., 10/25/23, at 2; Trial Ct. Orders, 12/10/21 (appointment of GAL) and 4/18/22 (appointment of child advocate). At this hearing, DHS presented testimony from two Community Umbrella Agency[4] (CUA) caseworkers: Holly Van-Geyten and Roya Paller. Mother testified on her own behalf. Ms. Van-

_____

> support and maintenance of the child during the period of the placement.

**Id.** at Art. V(a) (Retention of Jurisdiction).

[4] Community Umbrella Agencies (CUAs) are:

> community-based agencies that are responsible for the provision of direct case management services to families in their designated region [of the City of Philadelphia]. The CUAs ensure that local solutions and resources are more accessible to children and families. They develop connections to formal and informal neighborhood networks that can strengthen and stabilize families. In addition, they are responsible for recruitment and retention of foster and adoptive parents in the neighborhoods where children live.

**Interest of L.S.C.-P.**, 3135 EDA 2022, 2023 WL 4010857, at *8 n.7 (Pa. Super. filed June 15, 2023) (unpublished mem.) (citation omitted), *appeal denied*, 304 A.3d 19 (Pa. 2023). **See** Pa.R.A.P. 126(b) (providing that unpublished non-precedential decisions of the Superior Court filed after May 1, 2019, may be cited for their persuasive value).

Geyten identified the objectives DHS set for Mother to reunify with Child, which were to "sign all needed consents, participate in mental health services, continue to visit with Child in New York, . . . at Child's discretion, locate housing, and to provide proof of employment and income." N.T., 10/25/23, at 50 (formatting altered). Mother testified that she understood her reunification objectives were to obtain adequate housing, employment, have visitation with Child, and engage in therapy both individually and with Child. *Id.* at 16-18. Ms. Van-Geyten and Ms. Paller described the CUA services provided to Mother and Mother's efforts to meet her objectives over the course of more than two and half years (*i.e.*, from March 5, 2021, to October 25, 2023). *Id.* at 47-81. Over this same period, the juvenile court held ten permanency review hearings to monitor progress on Child's dependency case. *See* Trial Ct. Orders, 8/5/21, 11/2/21, 1/31/22, 4/18/22, 7/25/22, 8/10/22, 11/7/22, 1/30/23, 5/1/23, and 8/18/23. On July 14, 2023, more than two years after Child had been adjudicated dependent, DHS petitioned to involuntarily terminate Mother's parental rights and to change Child's permanency goal to adoption. *See* DHS's Pet. for Involuntary Termination of Parental Rights, 7/14/23; DHS's Pet. for Goal Change to Adoption, 7/14/23.

As of the date of the termination and goal change hearing on October 25, 2023, Mother had completed a parenting skills class and seen Child in

person once that year,[5] on October 14, 2023. N.T., 10/25/23, at 29, 44, 50. Mother also caused the cancellation of a scheduled in-person visitation in April of 2023, as on the day of visitation Mother informing Ms. Van-Geyten, who had traveled to New York to supervise the visit, that "she was still in our out [sic], and that she was not going to make it on time for the 12 o'clock visit[.]" *Id.* at 57-58. Mother had not seen Child in the six months preceding the filing of the petition to terminate her parental rights. *Id.* at 29, 50. Initially Mother had "liberal" supervised in-person visits and phone and virtual contact with Child. *See* Trial Ct. Order, 3/5/21, at 2. However, by August of 2022, Foster Mother had declined to further supervise in-person visitation between Mother and Child due to Mother's antagonistic behavior towards Foster Mother. *See* Trial Ct. Order, 8/10/22, at 2; *see also* N.T. 10/25/23, at 30-31, 72-74.[6] The juvenile court subsequently limited Mother's contact with Child to supervised phone and virtual communication, and further ordered that Mother could only

_____

[5] Ms. Van-Geyten testified that, while her ICPC counterpart in New York could not provide supervision, if Mother had requested, CUA could have "facilitated [Child] being brought down [to Philadelphia] for visits[,]" and that, to Ms. Van-Geyten's knowledge, Mother had never requested this type of assistance from CUA. N.T., 10/25/23, at 51.

[6] Ms. Van-Geyten testified that "[Foster Mother] showed me pictures of signs and notes that [Mother] had left on the door, indicating that [Foster Mother] was trying to steal her child[,]" and the neighbors saw the sign and "it put [Foster Mother] in a bad predicament . . . in her neighborhood[,]" and that Mother showed up at Child's school and Child was embarrassed about Mother's conduct and that Mother's conduct caused some mental health concerns for Child. N.T., 10/25/23, at 73-74.

have supervised in-person visits if Child agreed to the visit. *See* Trial Ct. Order, 5/1/23, at 2.

Child testified *in camera* that living with Mother was "[c]haos[,]" and that "[Mother] would do, like, really crazy stuff, like she would write on the walls, talking about there's people inside the walls and stuff . . . and she would think the fire detector was a camera." N.T. (*in camera*), 10/25/23, at 5-6. Ms. Van-Geyten testified that most of the time Child "declined the phone contact and the virtual [visitation with Mother]." N.T., 10/25/23, at 57.

Over the course of Child's dependency case, the juvenile court repeatedly ordered Mother to engage in mental health treatment services and for Mother to provide documentation of her treatment and progress to CUA. *See, e.g.*, Trial Ct. Orders, 3/5/21, at 2 (directing DHS to refer Mother for a psychiatric evaluation); 11/2/21, at 2 (ordering Mother "to re-engage in therapeutic services, including medical management and individual therapy, and provide updated treatment plan and progress notes/report"); 11/7/22, at 2 (directing that "CUA to reach out to Children and Youth in New York and request a mental health assessment for Mother" and "once [C]hild engages in individual therapy, family therapy with Mother to be explored"); and 1/30/23, at 2 (ordering Mother "to engage in [] therapy as soon as possible[]" and "Mother's progress notes and treatment plan to be provided at the next listing").

Mother testified that she has been diagnosed with "manic-depression 2," that she does not take any medication to manage this condition, and that

she has monthly virtual sessions with her therapist, with occasional in-person sessions with the same therapist. N.T., 10/25/23, at 25-29. Ms. Van-Geyten testified that there was no record of Mother's sessions with a therapist beyond January 2023, and that there were discrepancies between the session dates that the therapist reported in his letters to Mother and the provider's attendance records. *Compare* N.T., 10/25/23, at 52-54, *with* Trial Ct. Order 1/30/23, Exh. (letter from Mother's therapist dated January 26, 2023).

Mother testified that after her psychiatric hospitalization in November of 2020 she obtained an apartment in Philadelphia which DHS assessed to be adequate housing for Child, but Mother "surrendered th[is] apartment" when she learned that DHS intended to place Child in New York, and then obtained housing in New York. N.T., 10/25/23, at 18. At the time of the termination hearing, Mother maintained two homes, one in New York, and a two-bedroom apartment in Philadelphia that she had obtained about a week prior to the hearing. *Id.* at 33-34, 37. When asked whether there was a bed for Child in this Philadelphia apartment, Mother responded "I have plenty of furniture. I have furniture in storage . . . ." *Id.* at 37.

Ms. Van-Geyten testified that while this dependency matter was pending Mother had lived in at least two different residences in New York, and that Mother had not allowed DHS or CUA to perform an assessment of one of her prior New York residences, and had intentionally provided Ms. Van-Geyten with a false address when Ms. Van-Geyten had scheduled a visit to assess another of Mother's New York residences. *Id.* at 59. Ms. Paller testified that

Mother currently resided in the basement of a rooming house in New York, which was subdivided into several apartments with a common bathroom and kitchen. *Id.* at 55. Mother had not provided DHS with contact information for the other occupants of the living space, for the purpose of obtaining the appropriate clearances. *Id.* Consequently, DHS could not conclude that Child could be safely reunified with Mother in her New York residence. *Id.* at 56. As of the date of the termination hearing, Mother had not provided DHS with a copy of her lease for her new residence in Philadelphia; therefore, DHS had not had the opportunity to assess this housing and could not conclude that Child could be safely reunified with Mother at this location either. *Id.* at 34, 54-56.

Ms. Van-Geyten opined that Mother was not stable enough to have Child in her care, that DHS had ruled out reunification with Mother and Child, that termination of Mother's parental rights would not result in irreparable harm to Child, that Child had a loving bond with and wanted to remain with Foster Mother, and that it would be in Child's best interest to be freed for adoption by Foster Mother. *Id.* at 62-63, 68-69. When asked if Mother might be stable enough to reunify with Child "within the next month, two months, three months[,]" Ms. Van-Geyten responded, "No." *Id.* at 69-70. Ms. Paller testified that Child was "definitely ready to be adopted[]" and that Child "goes through a lot of disappointment with [Mother]. [Mother] makes promises of visits, time together, and doesn't show up. This is a lot of trauma for [Child] to go through." *Id.* at 80. Child, testifying *in camera*, did not object to

Mother's rights being terminated, and Child also indicated a desire to be adopted by Foster Mother. N.T. (*in camera*), 10/25/23, at 4-5.

Mother identified the obstacles to meeting her objectives to reunite with Child to be a lack of a support system, and that Child's dependency case was in Pennsylvania, while Mother had been residing in Maryland, and Child was relocated to New York during the pendency of this case, requiring Mother to travel between and work in up to three different states to meet her objectives. N.T., 10/25/23, at 13-22, 32-33, 38-39, 44.

At the conclusion of the hearing, the juvenile court terminated Mother's parental rights pursuant to the Adoption Act at 23 Pa.C.S §§ 2511(a)(1), (a)(2), (a)(5), (a)(8), and (b), and found that changing the permanency goal to adoption was in Child's best interest. **See** N.T., 10/25/23, at 88-94, **see also** Trial Ct. Rule 1925(a) Notice, 12/4/23, at 1-2.

Mother filed notices of appeal from the orders terminating her parental rights and changing Child's goal to adoption, and complied with Pa.R.A.P. 1925.[7] On appeal, Mother raises the following issues:

_____

[7] While represented by appointed counsel, on October 31, 2023, Mother filed a *pro se* notice of appeal from the juvenile court's dependency goal change order in Child's dependency case at docket number CP-51-DP-1232-2020. **See** Mother's *pro se* Notice of Appeal, 10/31/23. On November 24, 2023, Mother's prior counsel also filed a notice of appeal from the same order under the same docket number, CP-51-DP-1232-2020. **See** Mother's counseled Notice of Appeal, 11/24/23. This Court's Prothonotary assigned the docket number 2959 EDA 2023 to the second, counseled notice of appeal. This Court
*(Footnote Continued Next Page)*

1. Did the [juvenile] court err as a matter of law or abused its discretion where it determined that the requirements of 23 Pa.C.S. § 2511(a) to terminate [Mother's] parental rights were met?

2. Did the [juvenile] court err as a matter of law or abused its discretion where it determined that the requirements of 23 Pa.C.S. § 2511(b) were met?

3. Did the [juvenile] court err as a matter of law or abused its discretion where it determined that the permanency goal for [] Child[] should be changed to adoption?

Mother's Brief at 3 (formatting altered).

**Section 2511(a)(1)**

In her first issue, Mother asserts that DHS failed to present clear and convincing evidence to support termination of her parental rights under 23

---

dismissed the appeal at 2959 EDA 2023 as duplicative on December 29, 2023. **See** Order, 2959 EDA 2023, 12/29/23.

The juvenile court then appointed new counsel for Mother, and Mother's new counsel filed a brief on this matter on February 23, 2024. On March 5, 2024, DHS sought to quash this appeal as Mother had only appealed the juvenile court's goal change order at docket number CP-51-DP-1232-2020, but Mother's brief challenged "both the termination of parental rights under the AP [adoption] docket and goal change under the DP [dependency] docket." **See** DHS's Application to Quash Appeal, 3/5/23, at 1. On March 15, 2024, we denied DHS's quashal request, struck Mother's brief filed February 23, 2024, and directed Mother's counsel to petition the juvenile court to appeal *nunc pro tunc* from the October 25, 2023, order terminating Mother's parental rights. Order, 2900 EDA 2023, 3/15/24. On March 22, 2024, the juvenile court granted Mother's petition to reinstate *nunc pro tunc* her right to appeal the order terminating her parental rights. **See** Trial Ct. Order, 3/22/24. On March 27, 2024, Mother's counsel filed a notice of appeal from the order terminating Mother's parental rights in Child's adoption case, at docket number CP-51-AP-260-2023. **See** Mother's Notice of Appeal, 3/27/24. On April 4, 2024, we consolidated Mother's two appeals *sua sponte*, as they involve related parties and issues. **See** Order, 2900 EDA 2023, 897 EDA 2024, 4/4/24.

Pa.C.S. §§ 2511(a)(1), (a)(2), (a)(5), and (a)(8). *Id.* at 7-13. With regard to Subsection 2511(a)(1), Mother acknowledges that she fell short of achieving her reunification objectives, but contends that termination is not warranted as she made efforts to meet these objectives. *Id.* at 7-9. Further, Mother argues that she could achieve these objectives if she is given more time and asserts that she did not evidence a desire to relinquish parental rights. *Id.* at 8-9.

DHS responds that Mother failed to "perform parental duties" under Subsection 2511(a)(1), that "attempted performance is not performance[,]" and that parental duty "requires affirmative performance" and that a parent "must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship." DHS Brief at 15-18 (citing *In re Z.P.*, 994 A.2d 1108, 1118 (Pa. Super. 2010)).

We review the juvenile court's decisions in dependency and adoption cases for abuse of discretion or error of law and may reverse when that discretion has been abused or when the law has been misapplied. *Interest of K.T.*, 296 A.3d 1085, 1104 (Pa. 2023). "To the extent an issue raises purely a question of law or statutory interpretation, our standard of review is *de novo* and our scope of review is plenary." *Id.* (citations omitted). A party seeking involuntary termination of parental rights "must prove by clear and convincing evidence the existence of" a statutory ground under Subsection 2511(a) and, further, that "termination would best serve the child's needs and welfare pursuant" to Subsection 2511(b). *Id.* at 1105 (citing *In re Adoption*

- 12 -

*of C.M.*, 255 A.3d 343, 358-59 (Pa. 2021); 23 Pa.C.S. §§ 2511(a), (b)). A goal change order in dependency proceedings is also reviewed for abuse of discretion, and, in making such a goal change, the juvenile court must consider the best interest of the child. *In re R.J.T.*, 9 A.3d 1179, 1184, 1190 (Pa. 2010).

The Adoption Act, which governs when parental rights can be involuntarily terminated, provides in relevant part:

> **(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> * * *
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to Subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (b).

While the juvenile court terminated Mother's parental rights pursuant to four subsections of Section 2511(a), we need only conclude that DHS established by clear and convincing evidence that termination was appropriate

under one subsection of Section 2511(a), as well as Section 2511(b), to affirm. *See K.T.*, 296 A.3d at 1105.

Subsection 2511(a)(1) directs us to consider a parent's conduct in the six-month period immediately preceding the filing of the termination petition, and whether that conduct evidences a "settled purpose of relinquishing [a] parental claim to a child[,]" or a refusal or failure "to perform parental duties." 23 Pa.C.S. § 2511(a)(1). "The law does not require a settled purpose of relinquishing a parental claim **and** a refusal or failure to perform parental duties, but one or the other." *C.M.*, 255 A.3d at 364 n.12 (citation omitted and emphasis in original). Our Supreme Court recently re-affirmed the interpretation of "parental duty" relied on by DHS, describing it is "a positive duty requiring affirmative performance" and that a parent must "exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship, or h[er] rights may be forfeited." *Id.* at 364 (some formatting altered and citations omitted).

> However, even where the evidence clearly establishes a parent has failed to perform affirmative parental duties for a period in excess of six months, the [juvenile] court must examine the individual circumstances and any explanation offered by the parent to determine if that evidence, in light of the totality of circumstances, clearly warrants permitting the involuntary termination of parental rights. We have consistently emphasized the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. . . . In this vein, . . . [juvenile] courts deciding Subsection 2511(a)(1) cases [must] consider the whole history of a given case and not mechanically apply the six-month statutory

provision, although it is the six months immediately preceding the filing of the petition that is most critical to the analysis.

***Id.*** (some formatting altered and citations omitted).

If the statutory criteria in Subsection 2511(a) is met, our Supreme Court directs that three additional questions must be considered before concluding that termination is appropriate:

(1) The parent's explanation for his or her absence; (2) the post-abandonment contact between parent and child, including a parent's efforts to re-establish contact; and (3) consideration of the effect of termination of parental rights on the child pursuant to Subsection 2511(b).

***Id.*** at 365 (some formatting altered and citations omitted); ***see also In re J.T.M.***, 193 A.3d 403, 409 (Pa. Super. 2018) (explaining that once the criteria under Subsection 2511(a)(1) is met, the juvenile court must then consider the parent's explanation for conduct and the post-abandonment contact between parent and child, before moving on to analyze Subsection 2511(b)).[8] Another way to assess the "parental duty" criteria in Subsection 2511(a)(1) is to ask whether "the parent has utilized all available resources to preserve the parent-child relationship." ***See C.M.***, 255 A.3d at 365 (citations omitted).

_____

[8] While the procedural posture of ***C.M.*** was that of a petition filed by mother and maternal grandparents to terminate father's parental rights, the instant interpretation of Subsection 2511(a)(1) has also been applied to petitions filed by child welfare services agencies for dependent children, as is the case here. ***See C.M.***, 255 A.3d at 349, 365; ***J.T.M.***, 193 A.3d at 406, 409.

- 15 -

Here, the juvenile court explained:

In the six months preceding the filing of [the petition to terminate Mother's parental rights], [Mother] has [not] had any visits with Child in that time span. . . .

\* \* \*

[Mother] has not demonstrated that any additional time would remedy the situation.

\* \* \*

[Mother] seems to be in denial, blaming others, and . . . she does not have the appropriate support in order to be able to parent [Child].

N.T., 10/25/23, at 88, 90.

Following our review, we conclude that the trial court's findings with regard to Subsection 2511(a)(1) are supported by the evidence in the record, and we find no error in the trial court's legal conclusions. In the instant matter, Child came into DHS custody in November of 2020 because of Mother's inability to provide parental care or supervision of Child, due to a mental health crisis which required a thirty-day psychiatric hospitalization. *See* N.T., 10/25/23, at 15-16, 48. Mother self-reports that she has manic-depression, that she suffered a manic-depressive episode, and acknowledges that she was incapable of caring for Child at that time. *Id.* at 23-29. Mother testified that she does not take medication to manage this condition and treats her condition by attending monthly telehealth sessions with a therapist, but failed to provide proof of these therapeutic sessions beyond January 2023. *See id.* at 25-29, 52-54.

Under Subsection 2511(a)(1), DHS had the burden of proving by clear and convincing evidence that Mother had a "settled purpose of relinquishing [her] parental claim" or "refused or failed to perform parental duties" in the period of at least six months before petition filing. 23 Pa.C.S. § 2511(a)(1); *see also K.T.*, 296 A.3d at 1105; *C.M.*, 255 A.3d at 358-59, 364 n.12. The relevant period here is January 14, 2023 to July 14, 2023. During this period, Mother did not have any in-person contact and had limited telephone and virtual contact with Child. In terms of providing a safe home for Child, Mother twice failed to provide DHS with access to assess her residences in New York, and also failed to provide contact information for DHS to check the backgrounds of individuals with access to shared living spaces for her current New York residence. N.T., 10/25/23, at 55, 56, 59. Mother only obtained her current Philadelphia residence a week before the termination hearing and failed to provide DHS with a copy of the lease and DHS was not able to assess the residence prior to the hearing. *Id.* at 34, 54-6. On this record, which demonstrates Mother's lack of meaningful contact with Child and Mother's lack of suitable housing for Child, the juvenile court was within its discretion and committed no legal error in finding that Mother had failed to affirmatively perform her parental duties or exercise reasonable firmness in resisting obstacles placed in the path of maintaining her parent-child relationship with Child, pursuant to Subsection 2511(a)(1). *C.M.*, 255 A.3d at 364.

After finding that Mother failed to perform her parental duties toward Child under Subsection 2511(a)(1), the juvenile court was obliged to examine

- 17 -

any explanation offered by Mother as to why she had "failed to perform affirmative parental duties for a period in excess of six months, . . . with an eye to the best interests and the needs and welfare of" Child, and to consider the effect of termination of Mother's parental rights on Child. *Id.* at 364-65 (citations omitted).

Mother reported that achieving her reunification goals had been difficult due to having to travel between Pennsylvania and New York, that she does not have an adequate support system, and that DHS has failed to provide her with adequate supports to meet these goals. *See* N.T., 10/25/23, at 13-22, 32-33, 38-39, 44. Regardless of whether DHS could have done more to support Mother in her reunification goals, it is clear that Mother failed to make the most of the supports available to her, including failing to take advantage of all resources to maintain in-person contacts with Child, and canceling a supervised visitation with Child on the date scheduled. *See id.* at 51, 57-58. Mother's relationship with Foster Mother, who is also Mother's aunt, deteriorated over the course of the dependency case due to Mother's conduct, further reducing Mother's ability to visit with Child. *See* Trial Ct. Order, 8/10/22, at 2; 10/25/23, at 30-31. Child has increasingly declined in-person as well as telephone and virtual contact with Mother and has experienced a lot of disappointment with Mother and broken promises from Mother. *See* N.T., 10/25/23, at 57, 80. On this record, the juvenile court was within its discretion and committed no error of law in concluding that Mother had not utilized all available resources to preserve her relationship with Child, and,

further, that Mother's efforts to re-establish contact with Child fell short of the effort needed to serve Child's best interests, needs, and welfare. **C.M.**, 255 A.3d at 364-65, **J.T.M.**, 193 A.3d at 409. For these reasons, we discern no abuse of discretion by the trial court in concluding that termination of Mother's parental rights was appropriate under Section 2511(a)(1). Accordingly, Mother is not entitled to relief on this claim.

## Section 2511(b)

In her second issue Mother claims that the juvenile court erred by concluding that termination of her parental rights was appropriate under Section 2511(b). Although, Mother raised her Section 2511(b) claim in her Rule 1925(a)(2)(i) statement and in the issues presented, Mother did not articulate any argument as to how the juvenile court erred when it terminated her parental rights pursuant to Section 2511(b). **See** Mother's Brief at 12-13.

It is well-settled that

[an issue raised on appeal] is waived for failure to address this issue in a meaningful way or develop it [in] a meaningful fashion with citation to pertinent legal authority and/or reference to the record. **See** Pa.R.A.P. 2119(a)-(d); **see also In re W.H.**, 25 A.3d 330, 339 n.3 (Pa. Super. 2011) (quoting **In re A.C.**, 991 A.2d 884, 897 (Pa. Super. 2010)) ("[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived."); **see also In re M.Z.T.M.W.**, 163 A.3d 462, 465-466 (Pa. Super. 2017) (citation omitted) (reiterating that a claim is waived where an appellate brief fails to provide any discussion of the claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review).

*Interest of B.M.*, Nos. 2161 EDA 2023, 2162 EDA 2023, 2024 WL 1849803, at \*7 (Pa. Super. filed Apr. 29, 2024) (unpublished mem.) (concluding that failure to cite to relevant authority or develop issue for review in appellate brief resulted in waiver of claim that evidence was insufficient to terminate parental rights under Section 2511(b)).

As stated above, our review of a termination of parental rights requires a bifurcated analysis of Section 2511(a) and (b). *See K.T.*, 296 A.3d at 1105. However, we conclude that Mother has waived her Subsection 2511(b) claim because she failed to develop it and, therefore, no relief is due.[9] *See M.Z.T.M.W.,* 163 A.3d at 465-66.

## Goal Change

In her third issue, Mother contends that the juvenile court erred when it determined that Child's permanency goal should be changed to adoption. Mother's Brief at 3. Mother states that changing Child's "goal to adoption was premature[,]" but advances no argument and does not provide any citations to relevant authority for this claim. *Id.* at 5. Accordingly, Mother's goal challenge claim is waived on appeal. *See J.T.M.*, 193 A.3d at 408 n.5; *M.Z.T.M.W.*, 163 A.3d at 465-66. Even if Mother had adequately preserved this issue for appellate review it would be moot, as we have determined that

_____

[9] Even if Mother had not waived this issue, we would affirm on the basis of the juvenile court's conclusion that termination was in Child's best interests because Child does not object to termination of Mother's rights and wishes to be adopted by Foster Mother. *See* N.T. (*in camera*), 10/25/23, at 4-5; N.T., 10/25/23, at 93-94.

the juvenile court did not err when it entered an order terminating Mother's parental rights. *See In re Adoption of A.H.*, 247 A.3d 439, 446 (Pa. Super. 2021) (stating that a "termination decree necessarily renders moot the [juvenile] court's decision to change Child's goal to adoption" (citation omitted)).

Orders affirmed. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 9/10/2024